UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION

UNITED STATES OF AMERICA

v.                                                              NO. 5:18-CR-50-BJB

VICTOR EVERETTE SILVERS

* * * * *

SUPPLEMENTAL OPINION REGARDING DENIAL OF MOTIONS TO SUPPRESS

On October 14, 2018, a shooting occurred at Fort Campbell, Kentucky, killing Brittney Niecol Silvers and injuring James Frederick Keating III. A federal grand jury sitting in Paducah indicted Victor Everette Silvers on seven federal offenses related to that shooting. DN 14.

Shortly before the jury trial in this case, Silvers timely filed a number of motions to suppress testimony and evidence. The Court held an evidentiary hearing regarding these motions (DNs 180, 181, 182). At the conclusion of the hearing, the Court denied each of the motions. This supplemental written opinion is meant to clarify (but not alter) the basis for the Court's rulings.

## I.   Motion to Suppress Statements

Silvers moved to suppress "any and all statements obtained by law enforcement during the multiple interrogations of Mr. Silvers following his arrest on October 14, 2018." Motion to Suppress Statements (DN 180) at 1.[1] These covered what Silvers described as "numerous interrogations that occurred from October 14, 2018 to October 15, 2018." *Id.* at 12. The motion (at 2–8) listed five sets of statements, which the Government intended to introduce at trial, made by Silvers to:

1. U.S. Army Soldiers,
2. Military Police Officer Brandon Hughes,
3. Army CID Agent Clifton Dyer,
4. FBI Special Agent Sean Laferte and FBI Supervisory Agent Brad Mullins at CID Headquarters, and

---

[1] Silvers also sought suppression of any fruits of these statements, "including but not limited to any purported consent by him to search and seize his clothing, his DNA, his person for gunshot residue analysis, his phone records, his vehicle, and his house." Motion to Suppress Statements at 1. The consent issue is addressed below in connection with the motions to suppress physical evidence (DNs 181 & 182).

1

     5.  FBI Special Agent Sean Laferte and FBI Supervisory Agent Brad Mullins During Transport.

## A.  Statements made to U.S. Army Soldiers

Silvers sought to suppress three statements he made from the car: "Just shoot me," "Kill me," and "The man in the red shirt shot [my] wife."  Motion to Suppress Statements at 2.  Four soldiers near Silvers heard his statements and testified at trial: Caleb Bobbitt, Darshaun Sheka, and Drake Martin, and Connor Williams.  They were neighbors of Brittney Silvers and heard the gunfire near her apartment.  They grabbed their weapons, ran to the apartment, and pointed their weapons at Victor Silvers, who remained locked in his car until military police arrived.

The Supreme Court has held that officers must provide a suspect with warnings regarding the Fifth Amendment's protection against self-incrimination when the suspect is "in custody" and "subjected to interrogation."  *Miranda v. Arizona*, 384 U.S. 436, 467–68 (1966).  Silvers argued that because the off-duty U.S. Army service members who ran to the scene of the shooting didn't provide *Miranda* warnings, the statements they heard should be suppressed.  Motion to Suppress Statements at 11.

**1.  Forfeiture.**  Silvers's motion discussed these statements in a glancing fashion.  The background section and a section heading mentioned that unidentified soldiers "effectively detained" him in his car.  Motion to Suppress Statements at 2, 11.  But Silvers didn't "further develop the issue in the argument section of his brief."  *United States v. Smart*, 406 F. App'x 14, 17 n.3 (6th Cir. 2010).  The motion only mentioned custody; it didn't identify the questions that allegedly induced Silvers's statements.

The Government noted it didn't "interpret the motion to apply to unsolicited statements made by Silvers prior to his handcuffing by military police officers at the scene."  Response to Motion to Suppress Statements (DN 204) at 9.  So the opposition did "not discuss law applicable to the issue of custody and unsolicited statements."  *Id.*  Instead it offered to "supplement its response" if "the intent of the defendant" was in fact "to challenge such statements."  *Id.*

Despite this invitation, Silvers's reply again failed to argue that the soldiers triggered *Miranda* by subjecting him to an interrogation or its functional equivalent.  That reply (at 2, 3, 4, and 5) overwhelmingly focused on his lengthy formal CID and FBI interrogations, while merely alluding to brief statements made when "Mr. Silvers was trapped in his car while multiple soldiers pointed pistols and long guns at him."  *Id.* at 1.  It never explained why the statements from within the car resulted from interrogation or should otherwise be suppressed.

At the hearing, Silvers nevertheless explicitly asked the Court to suppress any testimony by Bobbitt and Martin regarding what they heard Silvers say from his car.

This was too late.  Particularly given the "notice" supplied by the Government's "brief in response," the defense briefs didn't do enough to stave off forfeiture.  *United States v. Santillana*, 540 F.3d 428, 433 n.1 (6th Cir. 2008).  Generally, "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."  *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (quotation marks omitted).  Nothing indicates why that wouldn't hold true here.  A defendant "seek[ing] suppression of his statement based upon a failure to receive his *Miranda* warnings … must demonstrate by a preponderance of the evidence that he was entitled to receive them"—that is, "that he was subjected to a 'custodial interrogation.'"  *United States v. Lawrence*, 892 F.2d 80 (6th Cir. 1989) (unpublished table decision) (citing *Connelly*, 479 U.S. at 168–69).

Read charitably, the defense motion and reply argued that Silvers was in custody when he made unidentified statements from his car.  But nowhere did it address the second part of the *Miranda* inquiry: whether the witnesses who heard those statements interrogated him after they ran to the scene.  *See United States v. Crowder*, 62 F.3d 782, 785 (6th Cir. 1995) (*Miranda* requirement applies "only when the defendant was in custody *and* was subject to interrogation").  The failure to press this argument before the hearing impeded the Court's ability to assess whether the record supported a finding of custodial interrogation sufficient to trigger *Miranda*'s protections.[2]  That means the defense forfeited the issue and failed to carry its burden in any event.  Either way, suppression is unwarranted.

**2. Interrogation.**  Even if the defense's oral arguments sufficed to preserve the issue, the suppression request would nevertheless fail.  A "person is in custody for purposes of *Miranda* if, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave."  *United States v. Williams*, 998 F.3d 716, 736 (6th Cir. 2021) (quotation marks omitted).  The Government accepts that Silvers was in custody.  But

[2] The defense faulted the Government for failing to bring these witnesses to the suppression hearing.  Hearing Tr. (DN 296) at 17:22–18:05.  Silvers argued that "[i]t's the Government's burden to establish why these solicited statements arrived," and that he didn't "know enough information" without "hear[ing] that [witness] testimony" and "shap[ing] [the] argument based off … those proffers that are made before the court and that testimony."  *Id.* But that absence was attributable to the defense for not clearly challenging the soldiers' statements in the motion to suppress.  *See United States v. Giacalone*, 853 F.2d 470, 483 (6th Cir. 1988) (defendant must make an initial showing of contested facts to be entitled to an evidentiary hearing).  The Government *did* produce witnesses at the suppression hearing to proffer in response to the challenges Silvers properly raised.  This is consistent with the law's requirements: "to mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine."  *United States v. Schumacher*, 611 F. App'x 337, 341 (6th Cir. 2015) (quotation marks omitted).  And when the soldiers later appeared to offer testimony during the trial, defense counsel didn't revisit this issue in a manner that would've allowed the parties to limit their testimony or develop a record regarding custody and interrogation.

these witnesses didn't question Silvers. So his statements within the car did not result from an "interrogation" triggering *Miranda*—that is, "express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980).

Defense counsel accurately described these neighbors' role at the suppression hearing: "several witnesses that were neighbors that resided on Contreras [Court] responded to render aid [and] grabbed their rifles. They also provided security. They cleared the house. They followed instructions from the military police that were on duty. They then provided sworn statements and did various other things to facilitate the investigation." Hearing Tr. (DN 296) 17:08–13. Counsel contended these witnesses were effectively conducting a joint law-enforcement investigation with military police and CID. But no investigation had yet begun. And the only statements they heard preceded the arrival of on-duty military police and the clearing of the apartment. Their role was that of Good Samaritans, not nosy pharisees.

Whether and when off-duty military bystanders could place a suspect in custody in a manner that required *Miranda* warnings is an intriguing question that doesn't demand an answer in this case.[3] Because "where a defendant makes a voluntary statement without being questioned or pressured by an interrogator, the statements are admissible despite the absence of *Miranda* warnings." *United States v. Murphy*, 107 F.3d 1199, 1204 (6th Cir. 1997). Neither the suppression briefs nor the hearing arguments (nor the later trial testimony, for that matter) identified any actual questions asked by the soldiers.

The Court's independent review of the witness statements in the record doesn't reveal any question-and-answer, either. Drake Martin was a neighbor who, according to his sworn statement, was talking on the phone with his wife when he heard at least two loud bangs. Sworn Statements at 5. He walked outside, heard a yell that someone had been shot, ran back inside for his weapon, and then headed outside. *Id.* He headed toward Brittney Silvers's apartment, where he encountered "a tall black man in a red long sleeve shirt" (James Keating) and "a black woman on the ground not moving." *Id.* Keating told Martin that the woman's husband "shot her" and was "sitting in a grey Chrysler [3]00 in the driveway." *Id.* Martin "approached the vehicle" with his "weapon up." *Id.*

Martin yelled at Silvers to exit the car and tried to the open the car door. He heard Silvers honking the horn, yelling at Martin to shoot him, and claiming that Keating shot Brittney. Martin again told Silvers to get out of the car. Silvers again

---

[3] Silvers equated these off-duty servicemembers with on-duty law enforcement officers. *See, e.g.*, Hearing Tr. (DN 296) 7:14–17 ("[T]hose neighbors … were not civilians—they're military service members—[and] were effectively deputized and worked alongside the military police and Army CID."). Neither party supplied any authority on this issue, and defense counsel acknowledged she couldn't offer any precedent applying *Miranda* to off-duty/on-base soldiers. *See id.* at 17:02–03.

tried to pin the shooting on Keating: "the guy in the red shirt shot [my] wife." *Id.* That man—Keating—"had blood on the side of his head," told Martin that "he was shot," and said "the man in the car" had shot Brittney. *Id.* So Martin told the man in the car to get out and explain the situation, "keep[ing] [your] hands where I can see them." *Id.* The record and testimony don't indicate that Silvers said anything else in response to Martin. That uncontradicted account is consistent with the statement of another servicemember, Caleb Bobbitt, who was out walking his dog. Bobbitt heard the shots as well as Martin yelling "for the subject inside the car to come out." *Id.* at 8.

The Government sought to (and did) introduce testimony that Silvers honked the horn, asked Martin to "just shoot [me]," and blamed Keating for shooting Brittney. Motion to Suppress Statements at 2; Sworn Statements at 5. These expressions, however, preceded any question from Martin, who at that point had only instructed Silvers to exit the car. To be sure, one line in the record (not highlighted by Silvers) indicates that Martin then told Silvers to get out and explain himself. Even assuming Martin's commands are questions potentially subject to *Miranda*, the point is moot: the parties didn't try to introduce or exclude any statement by Silvers in response to these words. *See United States v. Chalmers*, 554 F. App'x 440, 448 (6th Cir. 2014) (defendant who "blurt[ed]" out an incriminating statement was not interrogated).

In any event, the law would've permitted a law-enforcement officer to follow up on the information volunteered by Silvers about the shooting that had just happened. *See Tolliver v. Sheets*, 594 F.3d 900, 920 (6th Cir. 2010) ("Police may … ask clarifying or follow-up questions" when a suspect volunteers information). Silvers refused to exit the vehicle and repeatedly honked the horn, the weapons' whereabouts remained unknown, and authorities hadn't secured the site. In no way does this chaotic scene resemble an interrogation; nothing indicates these demands were designed to crack and prove a case at trial. The commands weren't "words or actions … that [the officers] *should have known* were reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 302. The neighbors' repeated requests for Silvers to exit the vehicle didn't require Silvers to say anything—just to leave the car.[4]

---

[4] *See, e.g., United States v. Anderson*, No. 17-cr-79, 2017 WL 3172762, at *3 (D. Minn. June 22, 2017) (commands to "stop the vehicle" and "get out of the vehicle" made by plain-clothes, off-duty officer making arrest weren't functional equivalent of interrogation, but were "intended solely and exclusively to effectuate the task of taking Defendant into custody") *report and recommendation adopted*, 2017 WL 3168958 (D. Minn. July 25, 2017); *United States v. North*, No. 1:16-cr-309, 2017 WL 9473407, at *10 (N.D. Ga. Aug. 8, 2017) (officer's direction to exit van and lie on the ground didn't seek verbal response, even though the defendant responded with questions), *report and recommendation adopted*, 2017 WL 3821854 (N.D. Ga. Sept. 1, 2017).

To be sure, a custodial interrogation "may result from statements or conduct other than express questioning." *Id.* at 744. But to justify suppression, the statement or conduct must "implicat[e] the concerns with police 'compulsion' and 'coercion' that animated the *Miranda* decision." *Id.* (citing *Innis*, 446 U.S. at 299–301). The neighbors' actions do not. They were issuing commands to end—rather than investigate—a dangerous situation. The law distinguishes interrogation from the basic "words or actions on the part of the police" that are "normally attendant to arrest and custody." *Innis*, 446 U.S. at 301.

Based on Silvers's own description, the neighbors' words commanded and directed him to leave the car in order to secure the scene and disable a suspected shooter who might still have been armed. *See, e.g.*, Motion to Suppress Statements at 2. That Silvers reacted with statements the Government considered incriminating doesn't transform the soldiers' instructions into questions or their functional equivalent. "Although the [officers'] instructions may have 'struck a responsive chord' with Defendant and indeed did provoke him to speak, this does not mean that it was reasonably foreseeable that the[ir] … conduct would elicit such a response." *United States v. Jones*, No. 13-cr-438, 2014 WL 950025, at *4 (E.D.N.Y. Mar. 11, 2014). Given "the absence of a custodial interrogation, the requirement to recite the *Miranda* warnings is not triggered and the analysis is at an end." *United States v. Woods*, 711 F.3d 737, 740 (6th Cir. 2013).

Regardless, military police hadn't yet arrived on the scene and the neighbors didn't know whether the guns and shooters were accounted for. Sworn Statements at 6 (Martin didn't see anyone with a weapon, but did see a gun on the ground); *id.* at 8 (Bobbitt and three others maintained security on the vehicle until military police arrived). As discussed below, this uncertainty and exigency provide an alternative basis for not requiring *Miranda* warnings on pain of suppression: the soldiers—even assuming custody and interrogation—had a valid reason to speak to Silvers in the interest of protecting themselves and the public during a potentially ongoing shooting. *See United States v. Williams*, 483 F.3d 425, 428 (6th Cir. 2007).

## B. Statements to Military Police

Brandon Hughes, a military police officer, arrived at the apartment at 9:30 p.m. and handcuffed Silvers before placing him into a patrol car. Hughes concededly placed Silvers in custody without *Mirandizing* him. Rather, Hughes asked him "what happened?" Sworn Statements at 3. Silvers responded that he and Brittney "got into a[n] argument over a text on her phone from another guy." *Id.* Hughes then asked "who all was here?" *Id.* Two armed men who tried to shoot him, Silvers answered. *Id.* at 3–4. Hughes asked for a description: one "black male" and another "white male" who "both had left in a black Nissan Altima," replied Silvers. *Id.* Hughes "asked if they had weapons," and Silvers answered "yes." *Id.*

6

*Miranda*'s so-called public-safety exception means Hughes's testimony didn't require suppression. "[W]hen officers ask 'questions necessary to secure their own safety or the safety of the public' … they do not need to provide" *Miranda* warnings. *Williams*, 483 F.3d at 428 (quoting *New York v. Quarles*, 467 U.S. 649, 659 (1984)). If an officer has reason "to believe (1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than police might gain access to that weapon and inflict harm with it," then the law doesn't necessarily punish un-*Mirandized* statements with suppression at trial. *Id*. If "those two conditions are satisfied and no other context-specific evidence rebuts the inference that the officer reasonably could have perceived a threat to public safety," then the public-safety exception applies. *Id*.

Hughes confronted a situation that posed a threat to public safety and acted accordingly.

*First*, Hughes had "reason to believe" that Silvers "might have" had a weapon. *Id*. Dispatchers sent Hughes to an active-shooter situation. Sworn Statements at 3 ("shots fired"); Hearing Tr. 32:15–17 ("shooting on post"). Upon arriving, Hughes saw gunshot victims. *Id*. at 33:11–18. He observed "a black male standing next to his car" with "two other males with M4s pointed at a certain vehicle" and a "female [who] was laying on the ground with either one or two individuals performing what looked like CPR." *Id*. This was plainly a public-safety emergency. Hughes knew that emergency services wouldn't enter the premises "until the scene was completely secured," so he instructed others nearby to put the gunshot victim in the "back of his patrol vehicle" so he could "[drive] her out to EMS." *Id*. at 33:23–34:03. Although Hughes testified that he didn't know whether Silvers was the shooter, he reasonably suspected that the man in the car might've been the shooter and still had a weapon.

*Second*, Hughes had reason to believe someone other than law enforcement could "access the weapon and inflict harm with it." *Williams*, 483 F.3d at 429. Before he left the scene, he saw two men with M4s pointed at a car containing Silvers, who refused to come out. Hearing Tr. 33:11–18. After returning, Hughes noticed that Silvers remained in the car and still wouldn't comply with commands. *Id*. at 34:06–10. Hughes didn't know who the shooter was, how many people were injured, or whether the house was secure. *Id*. at 36:04–09. He *did* know that Brittney had been shot and that Silvers remained unsecured. According to his police report, Hughes "yelled for [Silvers] to get out of the vehicle and to show me his hands," but Silvers repeatedly "honked the [car] horn." Sworn Statements at 3. Silvers eventually "got out of [his] vehicle and put his hands up and then laid down on the floor," though not without the use of some physical force by law enforcement to secure his compliance. Hearing Tr. 34:15–22. Particularly in light of Hughes's credible testimony at the suppression hearing, the fear that Silvers (or someone else) may have remained armed and dangerous was reasonable under the circumstances. *See, e.g.*, *United States v. Riley*, 685 F. App'x 390, 395 (6th Cir. 2017) (reasonable to fear for public safety given suspect's refusal to surrender to police during armed standoff.).

7

It matters little that officers eventually determined that Silvers did not actually have a weapon on him. They didn't learn that until after subduing and searching him. Hearing Tr. 38:12–15 (Hughes searched Silvers after handcuffing him and did not find gun "on his person"). Hughes responded to a shooting, didn't know the shooter's (or shooters') identity, transported one victim for medical attention, and found another victim and Silvers unrestrained at the scene. He hadn't yet conducted a protective sweep of the house. *Id.* at 36:04–09.

Nor does it follow that no threat persisted after Hughes handcuffed Silvers and "no more shots had been fired." *See* Hearing Tr. 117:15–16. Although the scene appeared to be "a little calm" immediately after Hughes' arrival, he realized that his initial assessment was incorrect once he saw "everything that was going on"—"two individuals with weapons, another guy that was shot," and a situation that was "more intense" than it originally appeared, with officers having "less clarity on what to do next." Hearing Tr. 39:24–40:06. Nothing indicated that the military police—who'd only just arrived—were the only ones armed. If Silvers was the shooter, then the gun remained missing. And if Silvers was not, then the shooter remained missing. Either way, Silvers was a potential source of information about an ongoing threat. So Hughes questioned Silvers to determine whether "anyone else was there that [military police] needed to be worried about." *Id.* at 35:25–36:03. This is a paradigmatic application of the public-safety exception to the *Miranda* requirement. Nothing about this record or narrative indicates Hughes's questions weren't "prompted by a concern for public safety." *United States v. Kellogg*, 306 F. App'x 916, 924 (6th Cir. 2009) (quotation marks omitted).

*Third*, Hughes's actions were consistent with an ongoing public-safety concern. In response to the information Silvers gave him, Hughes identified a "black Nissan Altima SV with Alaska plates" stopped at the nearby intersection. So Hughes left and immediately pulled the car over. Sworn Statements at 4; *see also id.* at 5 (Martin: military police "got a call saying they were looking for two more suspects in a Nissan Altima"). The driver's story checked out, so Hughes quickly released him. *Id.* at 4. The futility of Hughes's stop doesn't foreclose the public-safety exception any more than the falsity of Silvers's story about the Altima. Just because one suspect is handcuffed in a patrol car doesn't necessarily mean an emergency has ended. *See United States v. Williams*, 272 F. App'x 473, 478 (6th Cir. 2008) (public-safety exception may apply despite handcuffed suspect).

Against all this, Silvers presented "no other context-specific evidence" to rebut "the inference that [Hughes] reasonably could have perceived a threat to public safety." *Williams*, 483 F.3d at 428. But what responsible officer in this position would have disregarded the risk that others besides Silvers posed a threat to public safety? Asking Silvers "what happened" and "who all was here" was a natural and likely necessary reaction under the circumstances. Hughes's questions therefore didn't trigger *Miranda*.

### C. Statements to Army CID Agent Clifton Dyer

Later that night, at the Fort Campbell Criminal Investigation Division headquarters, Silvers made several statements to Army CID agent Clifton Dyer. As Dyer conducted his initial intake and discussed Silvers's consent to a search of his clothes, Silvers (unprompted by any question) volunteered that he had been running and was "looking at that murder … attempted murder. This guy really … he really was shooting at me and tried to like …. I watched him shoot Brittney as I was trying to run." Motion to Suppress Statements at 4 (quoting CID Interrogation Video (DN 180-1) at 1:12:25–1:21:45). Dyer didn't follow up on this account, but instead returned to the consent forms. Silvers then asked "So … [Brittney] didn't make it?" *Id.* at 5. Dyer said he didn't know, proceeded to discuss the consent form, and told Silvers he didn't have to talk if he didn't want to. *Id.* at 5–6. Silvers nevertheless indicated that he was willing to speak and signed a waiver form provided by Dyer.

Silvers's motion, tacitly assuming these statements were incriminating, contended that he didn't knowingly and intelligently waive his rights under *Miranda*. It maintained that Silvers was in a "distressed mental and emotional state." *Id.* at 10. And it suggested that Agent Dyer coerced Silvers's waiver by presenting the form to him "at the same time" Dyer "instructed" him "to undress and put on a hospital gown." *Id.* at 10–11. This, defense counsel implied, left Silvers with an unpalatable choice of either discussing consent to search his clothes or waiver of his right to remain silent. *See* Hearing Tr. 108:06–7.

**1. Pre-Waiver Statements.** At the suppression hearing, the Court reviewed video excerpts of the interrogation and heard Dyer's testimony on direct and cross-examination. "[W]hen [Silvers] initially arrived," Army CID personnel called "the EMS on scene to treat some wounds." *Id.* at 42:19–20. The room where Dyer questioned Silvers was quiet and calm, though Silvers at times appeared agitated— sitting with his palms facing up while his legs rocked up and down. Dyer used a civil tone and did not display or suggest any improper physical intimidation.

According to Dyer, and as shown on the recording, the "first thing [Dyer] did was explain a consent form to [Silvers] regarding his clothing." *Id.* at 43:13–15. As Dyer explained that part of the consent form, but before Dyer asked any questions about the facts of the case, Silvers made the statements the defense considered incriminating and the Government considered "spontaneous." *Id.* at 44:08–13.

Dyer didn't respond to the substance of Silvers's statement, but quickly redirected him to the waiver form: "Okay. This is just the overall investigation [that] we're looking into, okay? So, I mean, and this is up to you, all right, if you want to do your clothing, it just says here…." Motion to Suppress Statements at 4 (quoting CID Interrogation Video). Silvers then signed the document consenting to the search of his clothes. *Id.*

9

It is entirely not clear whether Silvers challenges the admission of these statements based on words or deeds by Dyer that the defense considers coercive. Regardless, "[v]olunteered statements of any kind are not barred by the Fifth Amendment." *Miranda*, 384 U.S. at 478; *see also Murphy*, 107 F.3d at 1204. The video and testimony make plain that Silvers's statements weren't responsive to anything Dyer said. Dyer asked Silvers about consent to search his clothing and hands for gunshot residue. These questions about constitutional rights aren't reasonably expected to elicit an incriminating statement—only a "yes" or "no" in some form or fashion. *See United States v. Kellogg*, 202 F. App'x 96, 103 (6th Cir. 2006). And they were asked in a manner "normally attendant to arrest and custody." *Innis*, 446 U.S. at 301. Silvers's answer was a non sequitur: rather than indicating whether he understood his constitutional rights, he started talking about how he witnessed an attempted murder while he ran away. That Dyer hadn't yet *Mirandized* Silvers doesn't bar the statement's admission into evidence.

**2. Post-Waiver Statements.**  After these interjections, Dyer turned to the *Miranda* waiver. He told Silvers that "before I can talk to you about the whole incident, I'm going to advise you of your rights." Motion to Suppress Statements at 4 (quoting CID Interrogation Video). Dyer testified (and the video showed) that he read Silvers his rights "[u]sing the standard CID Form." Hearing Tr. 44:21–25. This form advised Silvers that he did not have to "answer any question or say anything," had "the right to talk privately to a lawyer before, during, and after questioning," and could have "a lawyer present" with him during questioning. Waiver Form (DN 180-4) at 2. It also conveyed that Silvers had the right to "stop answering questions at any time, or [to] speak privately with a lawyer before answering further," even if he signed the form. *Id.*

Silvers again interrupted Dyer's explanation to ask about Brittney Silvers: "So, … she didn't make it?" Dyer again responded: "Like I said, I don't know. Okay. I just know that that's what we're looking into." Dyer resumed explaining the waiver form and asked Silvers whether he understood those warnings. The video recording showed Silvers nod in response, orally affirm that he understood, and say he had "no problems telling you what happened." *See* Motion to Suppress Statements at 5–6 (quoting CID Interrogation Video).

Silvers himself "read … out loud" the portion of the rights form confirming that he understood his rights and affirming that he wished to continue speaking with Dyer without a lawyer. Hearing Tr. 45:17–18; Army CID Interview 1:21:44–1:22:08. Silvers continued to speak with Dyer after signing the waiver form. According to Dyer, Silvers was "responsive" to the questions during the interrogation. Hearing Tr. 46:06–8.

The rights discussed in a *Miranda* warning may be waived. "To be valid, waivers of Fifth Amendment rights must be 'voluntarily, knowingly and intelligently' made." *United States v. Montgomery*, 621 F.3d 568, 573 (6th Cir. 2010) (quoting

*Miranda*, 384 U.S. at 444). The "waiver must be voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Berghuis v. Thompkins*, 560 U.S. 370, 382–83 (2010) (quotation marks omitted). And it must be knowing and intelligent in the sense that it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (quotation marks omitted). A *Miranda* waiver cannot be involuntary absent "coercive police activity." *Montgomery*, 621 F.3d at 573 (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)). As to knowledge, "[t]he crucial inquiry is not whether the defendant knew and understood every possible consequence of a waiver, but, instead, whether he knew that he could choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *United States v. Ray*, 803 F.3d 244, 266 (6th Cir. 2015) (quotation marks omitted). "[I]f the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension," then a court may conclude that a suspect waived his *Miranda* rights. *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

Silvers waived his right to counsel and silence—both out loud and on paper. Army CID Interview 1:21:44–1:22:08. Dyer's oral and written descriptions of Silvers's rights were accurate and complete. *Id.* at 1:19:00–1:20:44; Rights Warning Procedure/Waiver Certificate (DN 180-4) at 2. Nothing indicates that Silvers—a 29-year-old college student who managed a fast-food restaurant—couldn't "understand the warnings at the time of the interrogation." *Garner v. Mitchell*, 557 F.3d 257, 263 (6th Cir. 2009) (en banc) (waiver valid because police were "reasonable and careful in giving" *Miranda* warnings and "had no reason to believe" the defendant "misunderstood the warnings"). His counterarguments all fail.

*First*, defense counsel alludes to the length of time Silvers waited before the interview, but even if that argument were expressly raised it wouldn't render his oral and written waivers involuntary. *See* Hearing Tr. 104:20–106:01. The videotape of Silvers at CID began around 11:20 p.m.—approximately two hours after the shooting. The interview began around 1:08 a.m., approximately two hours into his wait. This is certainly relevant to interpreting Silvers's words and actions in waiving his *Miranda* rights. But the Sixth Circuit has held that "there is nothing necessarily coercive about a nine-hour interrogation, and nothing necessarily coercive about an interrogation that lasts into the night." *Redditt*, 87 F. App'x at 444 (citing *Ledbetter*, 35 F.3d at 1069 (confession after interrogation that lasted until 3:00 a.m. not coercive)); *see also United States v. Stokes*, 631 F.3d 802, 809 (6th Cir. 2011) ("Although [the defendant's] initial custody and interview did last for approximately five hours, interviews lasting several hours (as opposed to entire days) are not considered to be of great duration and are therefore not indicative of coercion.") (quotation marks omitted).

11

*Second*, the duration of Silvers's interrogation didn't make his waiver involuntary. *Contra* Hearing Tr. 105:19–106:01. Silvers noted, in the background section of his motion, that he "remain[ed] on video and in CID custody for approximately five hours and thirty-six minutes," and (according to the defense) "on camera [was] offered no food, two water bottles, and uses the restroom once." Motion to Suppress Statements at 7. But Dyer credibly testified that agents offered Silvers "water" and "restroom breaks" before the recording began. Hearing Tr. 43:05–06. This cuts against a finding that he was "cruelly deprived of sustenance" or prevented from accessing amenities during his interrogation. *United States v. Redditt*, 87 F. App'x 440, 444 (6th Cir. 2003) (9 hours without food not inherently "coercive"). And nothing about Dyer's questions suggest this period was significantly more intense, pressurized, or threatening than a police interrogation regarding a serious crime ordinarily would be.

*Third*, the "choice" between *Miranda* warnings and hospital gowns was not inherently or apparently coercive. Defense counsel argued at the hearing that Dyer gave Silvers an unfair choice between surrendering his clothes (pursuant to the search waiver that Silvers had just signed) or discussing his *Miranda* rights and waiver form: "Do you want to change into this gown," Dyer asked, "or do you want to do this," as he pointed to the *Miranda* waiver. Army CID Interview 1:16:18–22. This, according to the defense, implied that Silvers had to pick his poison. Hearing Tr. 107:16–18 (defense counsel: "It's a condition. 'Do you want to waive these rights, or do you want to strip down, take off your clothes and put on this hospital gown?'").

Even assuming this describes some sort of false or leveraged choice, that account is incomplete. Dyer also told Silver that he did *not* have to do either; he could remain silent, refuse consent, or both. Silvers nodded in response. Motion to Suppress Statements at 5. And Silvers signed a waiver acknowledging he didn't have to talk. The form Silvers signed indicated that he understood his rights, was willing to discuss the offenses under investigation, and would make a statement without first talking to a lawyer. Waiver Form at 2. Silvers didn't face a coercive choice to do something or else face some negative consequence. *Contra Harris v. Klare*, 902 F.3d 630, 641 (6th Cir. 2018) ("[F]orcing someone who has been in custody for over an hour to choose between consenting to a search and going to the restroom is one way to apply pressure") (quotation marks omitted). The procedural question whether to first address Silvers's clothes or his statement doesn't suggest that discussing *Miranda* rights first would benefit Silvers or that changing into a hospital gown would harm him.

*Fourth*, Silvers's "apparent fear, physical condition and emotional state at the time" didn't invalidate his waiver. Motion to Suppress Statements at 11. The video shows him "rocking back and forth" when he signed the consent form—moving "his upper body" and "shaking his legs." Hearing Tr. 53:1–5. This allegedly demonstrates that he was in a "distressed mental and emotional state" and therefore undermines the validity of his waiver. Motion to Suppress Statements at 10. Silvers also notes

that Dyer "denie[d] any knowledge of [Brittney] Silvers' condition." *Id*. This, Silvers argues, lead him to believe Brittney was "still alive." *Id*. Dyer secured his consent around the same time when he told Silvers for the first time that Brittney had died. *Id.*

Silvers's movements certainly seemed unusual and appeared to reflect the stress of a confrontation with law enforcement in the aftermath of a bloody criminal incident. But that is inherent to many police interrogations. Silvers offers no other evidence of coercion or incapacity calling into question the voluntariness of his waiver. From the police's perspective, which is how the law assesses questioning like this, *United States v. Al-Cholan*, 610 F.3d 945, 954 (6th Cir. 2010), Silvers's shaking did not overwhelm or undermine his statements and decision to sign the consent form. Dyer credibly testified that he "really did not read into it too much … other than it was late at night and that [it was] possibly adrenaline coming down from a significant event." Hearing Tr. 58:06–11. *See United States v. Brown*, 443 F. App'x at 959 (defendant's addiction and fidgeting during interview didn't show waiver was involuntary).

This may well have been the first time Silvers learned that Brittney had died, as he notes. But he had known for hours that she was gravely wounded and expressed no outward surprise or grief when he learned the news. Nothing indicates Dyer did in fact know that Brittney had died but withhold that information strategically. In any case, "withholding of information" is only relevant to the constitutional validity of a waiver "if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Moran*, 475 U.S. at 423–24. Silvers makes no such connection. *See id.* at 421 (waiver valid where "the record is devoid of any suggestion that police resorted to physical or psychological pressure to elicit the statements").

In the end, nothing about Dyer's questioning or treatment of Silvers rises to the level of "an irresistible inducement that would render the confession involuntary." *United States v. Wrice*, 954 F.2d 406, 411 (6th Cir. 1992). Dyer didn't purport to require Silvers to speak; he had a "real choice between talking and remaining silent." *Missouri v. Seibert*, 542 U.S. 600, 609 (2004). The context evident from the recording and Dyer's credible testimony make clear that no coercive efforts induced the waiver.

### D. Statements made to FBI Special Agent Sean Laferte and Supervisory Agent Brad Mullins at CID Headquarters

Silvers also gave statements the next day at CID Headquarters to FBI Special Agent Sean Laferte and Supervisory Agent Brad Mullins. Silvers's story changed after a break in this lengthy interview: initially he described seeing Brittney get shot by someone else, but later he described blacking out several times and shooting through a bathroom door during a physical confrontation with Brittney and Keating. "[H]e did not go over to the house that night intending to hurt Brittney or [Keating]"

and "did not want to hurt Brittney," Silvers said, but just "blacked out." Laferte FD-302a (DN 180-3) at 2. When asked whether he still had the gun at that point, Silvers responded "Yeah." FBI Interview Audio Disk 2 39:06–10.

Silvers again asks to suppress these statements—again based on the alleged invalidity of his waiver. This second interview happened after Silvers's interview with Dyer, after Silvers fell asleep in a chair in the interrogation room, and after Silvers (for the second time) signed a form waiving his right to remain silent. Silvers's previous interview with Army CID Dyer ended around 3:25 a.m. According to the video excerpts shown during the hearing, Silvers then slept in a chair in a dark room under a blanket until 9:46 a.m. The next morning FBI agents entered the room, finding him still asleep. *See* Hearing Tr. 65:09–11 (Laferte) ("When we first got there I believe he was in a dark room sleeping."); *id.* at 73:16–21 (similar). At 11:38 a.m., Mullins and Laferte began a second interview, which occurred in a different room. Unlike the Dyer interrogation, the FBI agents recorded this interview by audio only.

The recording, corroborated by Laferte's testimony, demonstrates that Laferte thoroughly explained the *Miranda* waiver using a civil tone. He and Mullins (who was sick during the suppression hearing and didn't testify) "introduced [themselves]" and then "started talking to [Silvers] about some of the things that [they] were hoping to search," such as "his vehicle," "a cell phone," and "his house on Wiser Drive in Clarksville." *Id.* at 62:19–25. Laferte testified, and the audiotape confirmed, that after "advis[ing] [Silvers] of his *Miranda* rights," Silvers "agreed to speak with" the agents. Hearing Tr. 66:06–13. Silvers also signed a written waiver. Second Waiver Form (DN 180-5) at 2. Laferte testified that he saw "no hesitation" from Silvers, who "was eager to talk to" them. Hearing Tr. 67:21–24. Laferte denied that he or anyone in his presence made any threats or used physical force against Silvers. *Id.* at 74:14–22. Silvers "had the opportunity to have food," which Laferte testified was "offer[ed]" to Silvers "multiple times throughout the interview." *Id.* at 70:19–22. And after an "hour [and] 15 minutes," the agents "got Mr. Silvers some lunch and just took a break." *Id.* at 71:17–72:04. No evidence contradicts this testimony.

Silvers, again, contends he did not knowingly and intelligently waive his *Miranda* rights. In support he maintains that Laferte did not confirm whether he understood his waiver: he "said only, 'you good with that?'", to which Mr. Silvers replied "I am." Motion to Suppress Statements at 7.

The *Miranda* decisions do not insist on confirmation of a waiver, however. So while "[a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver," *North Carolina v. Butler*, 441 U.S. 369, 373 (1979), a waiver "need not be made in writing, and need not be expressly made." *United States v. Adams*, 583 F.3d 457, 467 (6th Cir. 2009). Instead, it "may be clearly inferred … when a defendant, after being properly informed of his rights and indicating that he understands them, nevertheless does nothing to invoke those rights and speaks." *Id.* (alteration in

14

original) (quotation marks omitted). Here, Silvers supplied both (for the second time following his arrest): he orally acknowledged he understood his rights and signed a waiver form. Indeed, after confirming he understood his rights and acknowledging that he wished to waive them, Silvers continued talking with the two agents. Nothing rebuts the presumption that Silvers knowingly and intelligently waived his rights.

Laferte, like Agent Dyer before him, testified that in his view Silvers "understood" the rights detailed on the waiver form and understood "that he didn't have to talk to [the agents]." Hearing Tr. 68:21–69:04. He described Silvers as "coherent," "cognizant of what was going on," "giving detailed answers," and "correcting … mistakes that [the agents] had made" in their discussion of the night's events. *Id.* at 68:16–22. Nothing Laferte said on cross-examination contradicted this testimony on direct about Silvers's conduct, responses, or demeanor. The agents apparently "had no reason to believe that [Silvers] misunderstood the warnings" under these circumstances. *Garner*, 557 F.3d at 263; *see also* Hearing Tr. 72:12–22. So the particular manner in which they asked Silvers to confirm his understanding of the rights listed on the form provides no basis for invalidating the waiver. *See Garner*, 557 F.3d at 263; Hearing Tr. 103:18; Laferte FD-302a at 2.

Silvers's reply contends, for the first time, that "FBI agents baited him to confess by suggesting his mental illness led him to commit the crimes." *See* Reply re Motion to Suppress Statements at 4. To the extent this argument differs at all from his waiver-invalidity argument, it fails for the same reasons discussed above. "The test for whether a *Miranda* waiver is voluntary is essentially the same as the test for whether a confession is voluntary." *United States v. Binford*, 818 F.3d 261, 271 (6th Cir. 2016) (quotation marks omitted). "[S]ome kind of coercive police activity is required to establish that a waiver of *Miranda* rights, or a confession for that matter, was involuntary." *United States v. Brown*, 443 F. App'x 956, 959 (6th Cir. 2011) (quotation omitted). As discussed, Silvers failed to "identify any acts by the police that went beyond normal police-interrogation tactics." *United States v. Fein*, 843 F. App'x 765, 770 (6th Cir. 2021).

At this point Silvers had already voluntarily waived his *Miranda* rights. Nothing suggests that any of the circumstances discussed above had changed during this particular portion of this interview with the FBI agents. To be sure, Agent Mullins told Silvers before the interview ended that "we've talked for a couple hours and I see a smart and engaging guy who's clearly dealing with some mental health issues…." FBI Interview Audio Disk 2 02:50–02:56. Silvers cited no caselaw at all supporting his theory that an agent's discussion of his mental health necessarily means he involuntarily confessed. To the contrary, "[e]vidence that a defendant suffered, at the relevant time, from a condition or deficiency that impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process; some element of police coercion is always necessary." *United States v. Newman*, 889 F.2d 88, 94 (6th Cir. 1989). So this perfunctory argument fails.

Nor does any evidence indicate that the agents attempted any coercion or targeted his mental capacity in any way. His medications and suicidal ideations, Silvers maintained, "severely compromised" his "capacity to voluntarily and knowingly waive his *Miranda* protections" and left him unable to "appreciate the consequences of life-altering decisions." Reply at 3–4. Silvers told Laferte about suicide, self-harm, and taking Trazodone and Zoloft five times during the course of that interview. Hearing Tr. 89:22–90:02, 91:14–16. While Silvers "has some history of mental-health issues, nothing about his interrogation suggests he did not understand the questions posed or that he otherwise acted in a concerning manner." *Clayton*, 937 F.3d 630 at 642; *United States v. Treadwell*, 11 F. App'x 502, 511 (6th Cir. 2001) (waiver voluntary despite defendant having taken "intoxicating medication in a dose more than five times that prescribed by state physicians"). So Silvers's confession was voluntary notwithstanding his mental-health issues. He doesn't explain, let alone demonstrate, how his ideations or medications made him involuntarily confess.

### E. Statements made to Laferte and Mullins during Transport

After the interrogations ended at Fort Campbell that afternoon, Agents Laferte and Mullins drove Silvers to Paducah for his initial appearance. Motion to Suppress Statements at 8. They did not record the conversation because, according to Laferte, they didn't intend to interrogate Silvers further. Laferte FD-302a at 2; Hearing Tr. 75:22–24; 76:09–14 (Laferte "put all [his] stuff in the trunk of the car" because "the interview was over at that point"). Laferte rode in the back of the car with Silvers. Hearing Tr. 76:12–14.

According to Laferte's testimony at the suppression hearing, Silvers called his sister during the drive and then resumed discussing the shooting with the agents. Hearing Tr. 76:15–22. He told the agents that "Brittney was never shot inside" the house, but "was only shot once she went outside." Laferte FD-302a (180-3) at 2. And Silvers told the agents that after he realized Brittney was dead, he "chose to go back and kill [Keating]." *Id.* Laferte then asked Silvers how he "felt when he learned he shot [Keating]," to which Silvers responded "fuck that guy" and that he "did not care what happened to [Keating]." *Id.*

Silvers also mentioned a call he placed to his father the day before, while he was still in the Chrysler before surrendering. According to Laferte, Silvers said his father "told him to get everything off him, get out of the car with his hands up, and get on the ground." Laferte FD-302a at 2.[5] Silvers answered his father: "I've really fucked up." *Id.* During this conversation in the car, Agent Mullins and Silver went on to discuss "asking for forgiveness," which Laferte described as "tied into the greater context of religion." Hearing Tr. 86:17–20. Silvers "thank[ed]" Agent Mullins

---

[5] When the Government later called Silvers's father to the stand during trial, the father stated he couldn't remember the call due to an intervening stroke.

"for the opportunity to confess and to get it off [his chest]," saying he did "what [his] dad told [him] to do the night before." *Id.* at 76:23–77:06.

Nothing in the record indicates the agents threatened Silvers or his family—physically or otherwise. Nor did the agents initiate the conversation in the car; Silvers did. They didn't threaten Silvers; Silvers thanked them.

True, Silvers was not re-re-*Mirandized* before making these statements. And on that basis he argued that the Court should suppress them based on questions about "the reliability" of the confession "given the lack of any recordation of this alleged conversation" and the "inherently coercive nature of a … back seat confession in a squad car." *Id.* at 22:24–23:05; *see also* Motion to Suppress Statements at 11.

The Sixth Circuit has previously held that a "police car may in some circumstances be a coercive setting for a protracted interrogation." *United States v. Murphy*, 107 F.3d 1199, 1205 (6th Cir. 1997); *see also United States v. Brown*, 557 F.2d 541, 550–51 (6th Cir. 1977) ("The back seat of a patrol car is an inherently coercive setting for a confession."). Courts "must carefully sift the surrounding circumstances to discern any signs that the statement supposedly 'volunteered' by a prisoner was actually obtained under duress." *Brown*, 557 F.2d at 551.

Silvers relies primarily on the setting of this conversation, not on what the agents said to Silvers. But he cites "no case holding that coercion may be proved solely on the basis of placement in a police cruiser." *Murphy*, 107 F.3d at 1205. When pressed at the hearing, the defense couldn't identify any precedent in which the lack of a recording or placement in the back of a patrol car justified suppressing a confession of a *Mirandized* suspect. Hearing Tr. 22:24–24:25 (citing only a North Carolina statute).

The lack of a new *Miranda* warning doesn't offer Silvers much help. "Police are not required to rewarn suspects from time to time" regarding their rights. *Berghuis*, 560 U.S. at 386. "[A]dditional warnings are only required if the circumstances seriously changed between the initial warnings and the interrogation." *Treesh v. Bagley*, 612 F.3d 424, 432 (6th Cir. 2010). Silvers's circumstances arguably had since his FBI and CID interrogations: he was in the back of a car headed to his arraignment, rather than in a law-enforcement office on post. On the other hand, he was in custody the whole time, the car conversation didn't involve direct interrogation, and he was speaking to the same FBI agents. Since his arrest he'd already read and heard about his right to remain silent or request a lawyer at least twice—once in writing and once orally, as discussed above. Nothing indicates he was no longer aware of those rights or confused about their applicability. A confession, after all, "is much more likely to be voluntary when it is given after a person knowingly and voluntarily waives his *Miranda* rights." *Michael v. Butts*, No. 21-5862, 2023 WL 1432076, at *8 (6th Cir. Feb. 1, 2023) (quotation marks omitted). And when law enforcement has complied with *Miranda*," courts "rarely hold that a

defendant was induced to make a coercive statement." *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984)) (cleaned up).

Finally, defense counsel argued that Mullins's discussion of religion during the car ride amounted to a "coercive tactic" that "elicit[ed] statements from Mr. Silvers." Hearing Tr. 118:19–119:04 (objecting to "tal[k] about will God forgive [Silvers]"). But the record indicates that Silvers had already mentioned religious beliefs during the interview. "Mr. Silvers had brought up that he was a religious person," according to Laferte, and "that he listened to sermons on a daily basis." *Id.* at 77:13–16. That the agents "referred to [Silvers's] religious beliefs" did "not render [Silvers's] statement involuntary." *Berghuis*, 560 U.S. at 387. This objection is all too similar to the one the Supreme Court rejected in *Berghuis*, a case in which a detective's questions— after several hours of *Mirandized* interrogation—about whether the defendant "prayed to God for forgiveness" and "pray[ed] to God to forgive you for shooting that boy down" didn't render a statement involuntary. These responses sufficed to indicate waiver, not coercion, according to the Supreme Court. *Id.* at 386.

Here no evidence suggested that Mullins knew—much less exploited—that Silvers was particularly sensitive to discussing religious themes. And "the Fifth Amendment privilege is not concerned with moral and psychological pressures to confess emanating from sources other than official coercion." *Berghuis*, 560 U.S. at 386–87 (cleaned up). Nothing about Mullins's discussions about forgiveness amounted to intimidation, coercion, or deception. Even assuming some coercive tactics, moreover, no evidence indicates the agents' discussion with Silvers overbore any will on his part to remain silent.

## II.   Motion to Suppress Cell-Phone Evidence

Silvers also seeks to suppress physical evidence based on what he describes as unauthorized searches of his phone that allegedly lacked valid consent. *See* Motion to Suppress Cell Phone (DN 181) at 1.

Under the Fourth Amendment, "all searches and seizures must be reasonable" and "a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity." *Kentucky v. King*, 563 U.S. 452, 459 (2011). For a search to be valid, "a warrant must generally be secured," subject to "certain reasonable exceptions." *Id*. A "search that is conducted pursuant to consent" falls within such an exception to the warrant and probable-cause requirements. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

If a defendant moves to suppress seized evidence, the Government bears the burden of proving by a preponderance of the evidence that he voluntarily consented to the search. *See United States v. Matlock*, 415 U.S. 164, 177 (1974). The Government must show more than mere "acquiescence" to discharge that burden. *Klare*, 902 F.3d at 639 (quotation marks omitted).

Silvers told Agent Laferte that he could search the phone's contents, FBI Interrogation Audio Disk 1 8:07–40, and also signed a consent form specifying that officers could search "[m]y cell phone, [a] Samsung S-9 Galaxy, which is in my Chrysler 300." Consent to Search Form (Government Exhibit 3).[6]   Special Agent Kevin Artry retrieved the phone from Silvers's car and unsuccessfully attempted to extract its data using a "Universal Forensics Extraction Device."   The Government didn't try again until January 25, 2019, however.   And before it did, Agent Deterding—apparently out of an abundance of caution—obtained a warrant to supply a separate basis for the search besides consent.   Silvers nevertheless describes this as "a warrantless search," Motion to Suppress Cell Phone at 1, for which his consent was not valid, Reply to Cell Phone Response (DN 221) at 2.

## A. Consent

Silvers advances essentially the same arguments for the invalidity of his consent under the Fourth Amendment as he did in connection with his Fifth Amendment waiver, addressed above: his suicidal thoughts and medication allegedly compromised his mental capacity to knowingly consent.   Reply to Cell Phone Response at 1–2.[7]   The standards for "waiving" the trial right protected under the Fifth Amendment and "consenting" to a search or seizure under the Fourth "are not the same." *Montgomery*, 621 F.3d at 573.   But the parties haven't identified any way in which assessing whether Silvers "knowingly and intelligently" waived his *Miranda* rights differs from whether he "intelligently gave" consent to search his phone.   *See Schneckloth*, 412 U.S. at 246.   At points both parties use the lingo of waiver and consent interchangeably.

If "voluntarily given," consent "vitiates the warrant requirement."   *Id.* (quotation marks omitted).   Consent is voluntary if it is "unequivocally, specifically, and intelligently given, uncontaminated by any duress and coercion." *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999) (quotation marks omitted).   "Whether

---

[6] Silvers suggested in reply (DN 221 at 1) that the Government delayed producing the actual consent form.   But the defense doesn't contend any discovery delay warrants suppression.   And the Government's reliance on consent was hardly hidden; it appears (among other places in the record) on the face of the warrant affidavit (at ¶ 19).

[7] Because the filings contained personal identifying information that is sensitive and confidential, the Court granted a motion for leave to file several exhibits under seal: Exhibits 1, 2, 3, 4, and 5 to Silvers's Motion to Suppress Statements (DN 180); Exhibit 1 to Silvers's Motion to Suppress Cell Phone Evidence (DN 181); Exhibits 1, 2, and 3 to Silvers's Motion to Suppress Physical Evidence (DN 182); and Exhibits 1, 2, and 3 to Silvers's Motion to Exclude Prior Testimonial Statements (DN 183).   The Court's ruling also applied to the exhibits attached to the Government's reponses in opposition to those motions.   After the suppression hearing, the Court referred these motions to the Magistrate Judge for consideration of the appropriateness of continued sealing in whole or in part.

consent was free and voluntary" is "a question of fact to be determined from the totality of all the circumstances." *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004) (en banc) (quoting *Schneckloth*, 412 U.S. at 227).

"The general grounds" for the sort of arguments against consent raised by Silvers—in "the aftermath of the shooting and … medication"—"are well-plowed." *Montgomery*, 621 F.3d at 571.

> Voluntariness is a question of fact determined under the "totality of all the circumstances," which includes these considerations, among others: "youth of the accused; his lack of education, or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment such as the deprivation of food or sleep."

*Id.* at 571–72 (quoting *Schneckloth,* 412 U.S. at 226–27).

Given this standard, the motion to suppress evidence fails for effectively the same reasons as the motion to suppress Silvers's statements.  Silvers freely and voluntarily consented to the cell-phone search.  At the beginning of the second (FBI) interview, agents "started talking to [Silvers] about some of the things that [they] were hoping to search," such as "his vehicle," "a cell phone," and "his house … in Clarksville."  *Id.* at 66:06–13.  After securing consent to search his car and reading his *Miranda* rights, Silvers signed a written waiver, and "agreed to speak" with both agents.  *Id.* at 67:06–12.  As the interview proceeded, Laferte asked whether Silvers had a phone on him when he was in Brittney's house.  Silvers replied "no," and added that his phone was "in the car."  *See* FBI Interrogation Audio Disk 1 8:07–40.  Laferte then asked Silvers whether the agents could also search his cell phone.  *See id.* at 8:25–28.  "I do not care," Silvers responded, before telling the agents that if they "could go through [his] phone," they would "see a lot of stuff" Silvers said that "made so much sense."  *Id.* at 8:28–40.

Then another agent asked Silvers for his "biometric password" (fingerprint) and passcode so the agents could unlock the device.  Silvers gave both and the officers changed his code.  *Id.* at 76:02–08; 95:11–12.  Laferte detected "no hesitation" or "confusion" from Silvers when agreeing to the consent form.  *Id.* at 67:18–68:09.  Based on the portions of the audio recording played during the suppression hearing, the agents' tone sounded calm and unintimidating.  Silvers doesn't point to any threats or deceptions made by the officers.  And, as discussed, an hour and 15 minutes into the interview they took a break while Silvers ate lunch.  Laferte "gave [Silvers]" his jacket "to make sure [Silvers] was as comfortable as [they could] can make him."  *Id.* at 70:13–18.

Silvers's written and oral consents accord with Sixth Circuit caselaw. *See, e.g.*, *United States v. Williams*, 754 F.2d 672, 675 (6th Cir. 1985) (officer asked to open suitcase and defendant replied "no problem"); *United States v. Parrish*, 942 F.3d 289, 294 (6th Cir. 2019) (defendant who "worked with the officers to remove the passcode from his phone and change it" voluntarily consented to search). And nothing indicates that Silvers ever "retract[ed] his consent" after he began talking to Laferte. *Painter v. Robertson*, 185 F.3d 557, 567 (6th Cir. 1999).

The defense nevertheless contended the consent was involuntary. Silvers "did not have any wish to live" when talking to Laferte, and therefore "did not have the mental capacity to knowingly consent to government searches that could prospectively alter the rest of his life." Reply to Cell Phone Response at 2. In addition to Silvers's references to suicide, self-harm, and prescription medications discussed above, Hearing Tr. 89:22–90:02, 91:14–16, the motion also notes that Silvers had been held at gunpoint, punched during his arrest, and interrogated overnight, Reply to Cell Phone Response at 2.

This argument fails for at least three reasons.

*First*, even assuming the defense is right that prescription medication and suicidal ideations may be associated with diminished mental capacity, nothing about the evidence here indicates that Silvers's consent was not free and voluntary. "Voluntary consent can be given even by a person under the influence of drugs, when that person is coherent and fails to exhibit any visible impairment." *United States v. Griffin*, 124 F.3d 200, 200 (6th Cir. 1997). True, "medication or intoxication may diminish the capacity to consent to the extent it undermines an individual's grasp on the reality of what he is doing." *Montgomery*, 621 F.3d at 572. But the Sixth Circuit has rejected "a per se rule that medication (or intoxication) necessarily defeats an individual's capacity to consent." *Id.* Instead courts examine the "totality of the circumstances," including "the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; [and] whether the individual understands his or her constitutional rights." *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999) (quotation marks omitted).

Here, Laferte credibly testified that Silvers did not show any signs of impairment. And none are evident on the video or audio recordings, as discussed above. His age, education, and speech are consistent with someone who would understand a discussion of his rights and the decision to waive them by consenting to a search. And while medication or intoxication "may diminish the capacity to consent to the extent it undermines an individual's grasp on the reality of what he is doing," *Montgomery*, 621 F.3d at 572, Silvers identifies nothing in the record to that effect, *see United States v. Parrett*, 552 F. App'x 462, 463 (6th Cir. 2014) (defendant offered

21

"no evidence that her speech or actions were so impaired that a reasonable officer would think that her consent was not voluntary").

*Second*, the record includes no evidence that law enforcement took advantage of Silvers's mental state to coerce an involuntary consent. Even when a defendant was unresponsive or confused, courts have declined to suppress evidence obtained from a search if "the officers did not engage in any coercive behavior towards defendant that would vitiate consent." *United States v. Wilson*, 806 F. App'x 450, 454 (6th Cir. 2020). Nothing suggests that Laferte or Mullins did so. To the contrary, Laferte credibly testified that they didn't withhold food or facilities and that they advised Silvers of his rights—including his right to withhold or withdraw consent.

To be sure, Silvers consented to the searches after he had already been in custody for approximately 12 hours. But, as with his *Miranda* waivers, length of detention doesn't by itself call into question the validity of his consent. *See United States v. Lucas*, 640 F.3d 168, 174 (6th Cir. 2011) ("no single factor is dispositive."). And the fact of custody is not by itself "enough to vitiate an otherwise valid consent to search." *United States v. Salvo*, 133 F.3d 943, 953 (6th Cir. 1998). As described above, under the circumstances, Silvers's age, education, and responses all point to his capacity to make an informed decision. Silvers also mentions the physicality of his arrest, but never connects it to his later decision several hours later.

*Third*, the nature of the consent itself supports the Court's finding that it was voluntary and informed. Silvers's signed FBI FD-26 Consent to Search form stated that he had been "asked by Special Agents of the Federal Bureau of Investigation to permit a complete search" of various persons, places, and things, which included "my cell phone, [a] Samsung S-9 Galaxy, which is in my Chrysler 300." Government's Exhibit 3. Further, that form stated that "I have been advised of my right to refuse consent" and "I give this permission voluntarily." Silvers's words and actions didn't reflect a mere "expression of futility in resistance to authority or acquiescing in the officers' request." *See United States v. Taylor*, 820 F. App'x 359, 364 (6th Cir. 2020) (quotation marks omitted). His signed consent form, oral conformation, and cooperative conduct amounted to "unequivocal" expressions of his voluntary consent. *See e.g.*, *United States v. Canipe*, 569 F.3d 597, 604 (6th Cir. 2009) (defendant's answer that search "wouldn't be a problem" was unequivocal consent).

## B. Warrant

Setting aside consent, the warrant the Government obtained in January 2019 provides an independent justification for the search and precludes suppression.[8]

_____

[8] A valid warrant under the Fourth Amendment "require[s] only three things: (1) it must be issued by a neutral, disinterested magistrate or judge; (2) those seeking the warrant must demonstrate to the magistrate or judge their probable cause to believe that the evidence

Notwithstanding Silvers's consent on the night of the shooting, law enforcement obtained a warrant to search the phone "out of an abundance of caution." Search Warrant Affidavit (DN 181-1) at 11. In October, based on Silver's consent as discussed above, the agents tried unsuccessfully to search the phone. Special Agent Kevin Artry "attempted to conduct a UFED extraction of the device[,] which met with negative results." Agent Investigation Report (DN 181-2) at 4; *see also* Hearing Tr. 95:16–17 (Agent Deterding: "Fort Campbell CID attempted to download it but was unsuccessful"). Eventually, the agents decided to try again. But before they did, they obtained a warrant.

Silvers maintains the warrant lacked probable cause, particularity, and promptness. None of these contentions invalidate the warrant, which supplies a second sufficient basis for the Government's search of the cell phone.

**1. Probable Cause.** The warrant affidavit rested on more than "a fair probability that contraband or evidence of a crime w[ould] be found in" the phone. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The affidavit demonstrated the "nexus between the place to be searched and the evidence sought." *United States v. Elbe*, 774 F.3d 885, 889 (6th Cir. 2014). It relayed that Silvers used his phone to call Brittney, which violated the conditions of a court order. Search Warrant Affidavit at 7–8 (Silvers arrested and charged with domestic violence and "enjoined from contacting" Brittney); Tenn. Case No. W-18-021822 (enjoining Silvers from contacting Brittney). That violation served as the basis for one of the federal charges against Silvers.

Despite the communication restrictions placed on him, Silvers admitted to calling Brittney. And witnesses overheard Silvers threating to kill Brittney during a phone conversation between Silvers and Keating. The affidavit made all this (and more) clear:

> Silvers initially denied involvement in the crimes, but later confessed to shooting B. Silvers.… During the interview, Silvers mentioned talking with B. Silvers, by phone, earlier in the day. Silvers signed a Consent to Search his Samsung Galaxy S9 cellular telephone. CID retrieved the cell phone from his vehicle and brought it to Silvers and Silvers put in the fingerprint pattern to unlock the cellular phone. While being transported to the U.S. Federal Court in Paducah, Silvers continued

---

sought will aid in a particular apprehension or conviction for a particular offense; and (3) the warrant must particularly describe the things to be seized, as well as the place to be searched." *United States v. Smith*, No. 21-1457, 2022 WL 4115879, at *3 (6th Cir. Sept. 9, 2022) (cleaned up).

talking with Interviewing Agents.  Silvers stated that once he got into
his car, he called his dad and told him "I've really fucked up."

Search Warrant Affidavit at 9–10; *see also* Hearing Tr. 133:11–24 (listing information
connecting warrant and offenses).  The affidavit went on to note that two witnesses
overheard Silvers threatening Brittney, by phone, the night before she was killed.
Search Warrant Affidavit at 10 ("[S]ubsequent investigation" revealed that two
witnesses "overheard a phone conversation between Silvers and Keating, prior to the
night of the shooting, in which Silvers threatened to kill Keating and B. Silvers.").[9]

Courts are "entitled to draw reasonable inferences about where evidence is
likely to be kept, based on the nature of the crime and type of offense." *United States
v. Williams*, 544 F.3d 683, 686 (6th Cir. 2008) (quotation marks omitted).  And a judge
could reasonably infer that, for example, evidence of Silvers's "intent to engage in
conduct that violates … portion[s] of a protection order" would be found on his phone.
*See* 18 U.S.C. § 2262(a)(1).  Searching his phone for "conversations, text messages,
and social media communications between" Victor and Brittney Silvers could aid in
investigating or prosecuting violations of 18 U.S.C. § 2261(a)(1) (interstate domestic
violence) and 18 U.S.C. § 2262(a)(1) (interstate violation of protection order).  Search
Warrant Affidavit at 21.

Despite Silvers's attacks on the reliability of the informants and the necessity
of the search, the nexus here is abundantly clear and described throughout the
affidavit.  *See, e.g.*, *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000) (affidavit
is "judged on the adequacy of what it does contain, not on what it lacks, or on what a
critic might say should have been added.").  This wasn't a situation in which the "CI's
tip is the only direct connection between" Silvers's crimes and his cell phone.  *United
States v. Sanders*, --- F.4th ----, No. 21-5945, 2023 WL 1776587, at *4 (6th Cir. Feb. 6,
2023).

Litigating whether his call to Brittney did or did not violate the protective
order (as Silvers attempts at page 8 of his Motion to Suppress Cell Phone (DN 181))
is not the point.  The question is simply whether the phone was likely to contain
*evidence* of that and a much broader set of crimes listed in the warrant, including
murder, interstate domestic violence, and various firearm crimes.  This objection

---

[9] The Motion to Suppress Cell Phone (at 9) attempted to call the affidavit into question
by noting the anonymized nature of the witnesses it cited.  But "contrary to defendant's
contention, there is no requirement that an informant be named either in the affidavit or the
search warrant." *United States v. Jackson*, 470 F.3d 299, 308 (6th Cir. 2006).   This
information came from a "'known' (albeit unnamed) informant," which carries greater weight
than the word of a purely anonymous tipster.  *Smith*, 2022 WL 4115879, at *4.  Regardless,
probable cause would've been clearly established even without this additional point of
connection between Victor Silvers, his phone, and Brittney Silvers's death.

"conflates probable cause with proof." *United States v. Tagg*, 886 F.3d 579, 589 (6th Cir. 2018) (citing *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (probable cause does not require "an actual showing" of illegal activity). The point is that Silvers's admitted and observed use of this phone at the scene of this crime involving his wife added up to a more than "fair probability that … evidence of a crime w[ould] be found in" the phone. *Gates*, 462 U.S. at 238.

**2. Particularity.** The attachments to the warrant "describe[d] with particularity" the evidence sought. *United States v. Carter*, 792 F. App'x 366, 368–69 (6th Cir. 2019) (quotation marks omitted). "A warrant that empowers police to search for something satisfies the particularity requirement if its text constrains the search to evidence of a specific crime." *United States v. Castro*, 881 F.3d 961, 965 (6th Cir. 2018).

Silvers contended that the warrant is insufficiently specific in two respects. Its request for records, counsel argued, contains "no qualification on what sorts of records or categories of records that means or categories of records that means." Hearing Tr. 136:13–20. And its request for a list of "associates" means that "every single person that's potentially an associate of [his] is fair game." *Id.* at 136:21–24. Defense counsel conceded, however, that these categories could plausibly be read in light of the "qualifying statements in the application," rather than given their "maximum possible linguistic reach." *Id.* at 137:06–11.

Indeed, the affidavit didn't seek any and all records and information, but instead "[r]ecords of conversations or communications between Silvers and third parties relevant to the charged crimes and/or attempts, desires, or intention to commit crimes against B. Silvers." Search Warrant Affidavit at 27. And the face of the warrant ties its scope to the crimes charged: 18 U.S.C. §§ 1111(a) and (b), 2261(a)(1) and (b)(1), 2262(a)(1) and (b)(1), 922(g)(8) and 924(a)(2), 924(c)(1)(A), and 924(j)(1). So the affidavit "contained a global modifier that limited its scope to items that were related to a list of offenses for which there was probable cause to think [the suspect] had committed." *United States v. Willoughby*, 742 F.3d 229, 233 (6th Cir. 2014). That "supplied enough information to guide and control the agent's judgment in selecting what to take." *Id.* (quotation marks omitted). Investigators, after all, aren't expected to know and enumerate every name or document that may prove relevant before seeking a warrant. *Cf.* Hearing Tr. 136:07–137:17. And imperfect foresight doesn't necessarily amount to an improper general search. *See United States v. Richards*, 659 F.3d 527, 541 (6th Cir. 2011). Besides, Silvers does not contend that the search process was actually abused by the federal agents. *See id.* at 542; Hearing Tr. 137:23–25.

**3. Delay.** The passage of time between the phone's seizure and the warrant's issuance didn't invalidate the search, either. True, "even with the existence of

probable cause to effect a seizure, the duration of the seizure [of property] pending the issuance of a search warrant must still be reasonable." *United States v. Respress*, 9 F.3d 483, 488 (6th Cir. 1993). Silvers points to decisions from the Second and Tenth Circuits in arguing that the 103-day period between seizure and search was unreasonable.[10] Tellingly, both decisions ultimately sided with the Government in *rejecting* efforts to suppress evidence obtained through delayed warrants.

The Tenth Circuit, in an opinion written by then-Judge Gorsuch, accepted that "an unreasonable delay in obtaining a search warrant can sometimes violate the Fourth Amendment." *United States v. Christie*, 717 F.3d 1156, 1162 (10th Cir. 2013). But it held that "a five-month delay isn't constitutionally unreasonable," at least not "when an investigator obtains property by consent and retains it without objection, and when his search is delayed by virtue of having to attend to other and higher law enforcement priorities and no evidence suggests a reassignment was reasonably possible." *Id.* at 1164. The Second Circuit declined to suppress based on the officers' good faith, but addressed considerations similar to the Tenth's in considering the (un)reasonableness of a month-long delay: the duration, the importance of the seized property to the defendant, whether the defendant had a reduced property interest in the seized item, and the strength of the state's justification for the delay. *See United States v. Smith*, 967 F.3d 198, 206 (2d Cir. 2020).

The FBI's delay in obtaining a warrant and extracting data from Silvers's phone was reasonable in light of the record evidence. Agent Deterding testified credibly to the work that needed to be accomplished in the intervening period: "getting all the evidence that was collected sent to the FBI laboratory for analysis," "coordinat[ing] with CID to get the reports and conduct the joint investigation," coordinating the autopsy, and working with the ATF about the firearm purchase and records. Hearing Tr. 96:08–17. He further testified that there were "a lot of items" that needed to be catalogued and processed for this case. *Id.* at 96:23–97:02. Plus, Deterding's unit "cover[s] 15 counties" and has "two agents in Hopkinsville," so they "had a lot of [other] investigations" on their plate. *Id.* at 98:03–04. Silvers did not "disput[e] the existence" of these competing priorities or elicit any testimony or proof

---

[10] Neither party pointed to Sixth Circuit authority addressing whether or when the length of time between seizure and warrant-authorized search constitutes an unreasonable delay. At least some decisions arising from within the Sixth Circuit have addressed the question of delay—though apparently not under circumstances quite like these. *See, e.g.*, *United States v. Reid*, 67 F.3d 300 (6th Cir. 1995) (five-hour delay between seizure of package and obtaining a warrant wasn't unreasonable) *United States v. Taylor*, No. 6:21-cr-13, 2022 WL 16922105, at *12–14 (E.D. Ky. Nov. 14, 2022) (citing Tenth Circuit decision and concluding four-month delay wasn't unreasonable); *United States v. Davis*, No. 18-cr-20085-02, 2021 WL 4192045, at *4–6 (E.D. Mich. Sept. 15, 2021) (citing Second Circuit decision and concluding one-year delay wasn't unreasonable).

to the contrary. *Christie*, 717 F.3d at 1163. Defense counsel simply assumed that "[t]he case agent delayed for 103 days because searching the cell phone was not a priority for their investigation." Hearing Tr. 131:10–13.

Equally damning for Silvers's delay argument is his consent to the phone's seizure and failure to "rais[e] [any] objection to the seizure either at the time or in the following weeks and months." *Christie*, 717 F.3d at 1163; Hearing Tr. 97:13–18. "If the phone had been returned," Silvers perhaps "could have given it to a loved one." Hearing Tr. 135:23–24 (counsel for Silvers). But this speculative hindsight has no bearing on the facts of this case: he never tried to do so. And nothing indicated he sought to revoke his consent to the seizure for that or any other purpose. And no one else ever asked the agents to return the phone, either. *Id.* at 97:13–14. Obviously Silvers couldn't have continued to use the phone like normal while incarcerated. *See id.* at 97:07–12. All of this gave the agents a good-faith belief that they had permission to control Silvers's phone. Even if the consent had ultimately proved ineffective when challenged in court, nothing indicates the agents should've anticipated that or doubted their control at the time. *See Christie*, 717 F.3d at 1163.

Under other circumstances, perhaps, "it is reasonable to expect that [agents] will not ordinarily delay a month or more before seeking a search warrant" after seizing a person's property. *See Smith*, 967 F.3d at 206–07 (month-long delay in obtaining warrant unreasonable). But here the affiant and his colleagues had a good-faith basis to believe that Silvers voluntarily provided the phone, consented to its seizure, and authorized its search: Deterding swore that the FBI was in "lawful possession" of the phone based on Silvers's "signed … consent to search" and his decision to unlock the phone with his fingerprint. Search Warrant Affidavit at 11. The affidavit even acknowledged that the warrant might not be necessary given this consent, but was sought "out of an abundance of caution." *Id.* And the phone, obtained from Silvers at the crime scene, had evidentiary value to the Government regardless of the data agents ultimately discovered after a search. *Cf. Smith*, 967 F.3d at 209. On these facts, no reason suggests that Deterding did not have a reasonable and good-faith belief that Silvers's consent authorized the Government to keep the phone without a warrant.

The delay, therefore, did not violate the Fourth Amendment and invalidate the warrant. But even if it did, as discussed below, the Court would not apply the exclusionary rule because law enforcement had a good-faith basis to rely on the warrant.

**4. Good Faith.** The Government is correct that the good-faith exception to the warrant requirement would bar suppression here even if the warrant were invalid in some respect.

"[T]he relevant question is whether the officer reasonably believed that the warrant was properly issued, *not* whether probable cause existed in fact." *United States v. Hython*, 443 F.3d 480, 487 (6th Cir. 2006) (quotation marks omitted). As the Government explained, "[t]his is not a bare-bones affidavit so lacking in any indicia of reliability that a reasonable officer would not rely on the warrant." Response to Cell Phone Motion (DN 205) at 7.

 "An affidavit cannot be labeled bare bones simply because it lacks the requisite facts and inferences to sustain the magistrate's probable-cause finding." *See United States v. White*, 874 F.3d 490, 497 (6th Cir. 2017) (quotation marks omitted)). Certainly this "affidavit contain[s] a minimally sufficient nexus between the illegal activity and the place to be searched … even if the information provided was not enough to establish probable cause." *United States v. Carpenter*, 360 F.3d 591, 596 (6th Cir. 2004). As explained above, the affidavit wasn't lacking at all—and certainly "not totally lacking in facts" connecting Silvers's phone to the domestic-violence, murder, and attempted-murder charges. *Id.* And the record indicates the agents' basis for keeping the phone between their unsuccessful and successful extractions was likewise held in good faith.

### C.  Fruit of the Poisonous Tree

Silvers filed a separate motion to suppress several pieces of physical evidence, including Silvers's cell phone. Motion to Suppress Physical Evidence (DN 182). That motion is discussed below—except to the extent that it (like DN 181) relates to the phone. The defense acknowledged that it sought suppression of the phone in two parallel motions: it "challenged" the "warrant issued to search" Silvers's phone "simultaneously … in a separate motion [that is, DN 181] also filed this date," while here challenging the "initial searc[h]" of "Mr. Silvers' phone." DN 182 at 1 n.1.

The import of this short, successive motion on the arguments already discussed above is hard to decipher. But in hopes of keeping things straight, this opinion addresses the phone-suppression arguments together here in Section II. After all, this second request to suppress the phone evidence fails for the largely same reasons the first did: Silvers's consent, the Government's warrant, and the agents' good faith.

Silvers argues that "prior to the issuance of *any* warrant, law enforcement conducted searches of Mr. Silvers' phone" that were "improper and in violation of the Fourth Amendment." *Id.* This appears to relate to Agent Artry's initial failed attempt to extract data from the cell phone using Silvers's thumbprint. *See, e.g.*, Hearing Tr. 129:17–21, 130:09–11. "[B]ecause those initial searches and seizures were unlawful" due to Silvers's "involuntary waiver," according to defense counsel, any "subsequent search or attempt to get a search warrant … is fruit of the poisonous tree and should be suppressed." *Id.* at 130:12–16.

Even assuming the failed initial extraction violated the Fourth Amendment, that doesn't mean the subsequent successful search also did.  After all, the second search was authorized by a warrant whose validity Silvers doesn't attack in this parallel motion.  *See United States v. McClain*, 444 F.3d 556, 565 (6th Cir. 2005) (refusing to apply exclusionary rule to evidence seized from a second search "in which the affidavit supporting the search warrant [was] tainted by evidence obtained in violation of the Fourth Amendment").

Here, the first search was lawful.  And the warrant for the second search wasn't justified based on any fruits from the first search—because the first search (the extraction) produced no fruit.  Even assuming it had, and further assuming those fruits affected the issuance of the warrant, suppression would remain unwarranted.  That is because "the officers who sought and executed the search warrants acted in good faith" and "the facts surrounding the initial ... search were close enough to the line of validity to make the executing officers' belief in the validity of the search warrants objectively reasonable." *United States v. Tucker*, 742 F. App'x 994, 1002–03 (6th Cir. 2018) (quotation marks omitted).

## III.   Motion to Suppress Physical Evidence

Finally, Silvers moved to suppress several other pieces of physical evidence beyond the phone: "the search of his hands for gunshot residue analysis, as well as the search and seizure of his clothing, Samsung Galaxy cellular phone, laptop, vehicle, and residence, and any forensic results deriving from those searches."  Motion to Suppress Physical Evidence (DN 182) at 1.  This additional motion to suppress physical evidence, DN 182, is almost entirely barebones and repetitive of the earlier motion to suppress evidence recovered from Silvers's cell phone, DN 181.  The only argument seriously raised in the second motion but not the first is the unpersuasive fruit-of-the-poisonous-tree argument addressed above.  Otherwise Silvers argues only that he "did not voluntarily, knowingly, and intelligently consent to the searches and seizures conducted." *Id*.  To the extent this motion offers additional substantive arguments for suppression, those contentions differ almost imperceptibly from those rejected above.  For effectively the same reasons, Silvers fails to justify suppression of these items of physical evidence.

### A. Clothing

As with the *Miranda* waiver and search consent discussed above, video recording shows that Dyer obtained Silvers's oral consent to search his clothing.  And Silvers signed a consent form as well. *See* Hearing Tr. 43:12–44:07.  Dyer credibly described, under oath, how law enforcement obtained Silvers's consent without using any coercive tactics, intimidation, or deception.  Nothing in the record indicates Silvers's consent was not given freely and voluntarily.

## B. Gunshot Residue

Special Agent Hokenson obtained Silvers's consent to examine his hands and perform a gunshot-residue analysis. *See id.* at 47:03–08. Hokenson did not testify at the suppression hearing. But the totality of the circumstances (largely for reasons discussed at length above) shows that Silvers's consent was voluntary.

First, "[n]obody disputes that [Silvers] signed a consent form and thus gave specific and unequivocal consent." *United States v. Sheckles*, 996 F.3d 330, 346 (6th Cir. 2021) (quotation marks omitted); Consent to Search Hands for Gunshot Residue (Exhibit 9). Second, Silvers's age and education do not suggest he "was uniquely susceptible to duress or coercion." *United States v. Blomquist*, 976 F.3d 755, 759 (6th Cir. 2020). Third, the record doesn't indicate that Silvers objected to the search or was in such "a heightened emotional state" that he couldn't voluntarily consent. *Contra* Motion to Suppress Physical Evidence at 2. Fourth, as explained above, the Sixth Circuit has rejected "a per se rule that medication (or intoxication) necessarily defeats an individual's capacity to consent." *Montgomery*, 621 F.3d at 572.

Nothing Dyer said on cross-examination regarding his interactions with Hokenson and Silvers contradicted the government's proof that Silvers voluntarily consented to this search. Given the absence of facts indicating police coercion, the record indicates that Silvers's consent was "unequivocally, specifically, and intelligently given, uncontaminated by any duress and coercion." *Worley*, 193 F.3d at 386.

## C. Wiser Drive Residence

Silvers's motion "only challenges the search of Wiser Drive to the extent that it was based on his alleged consent to search the home." Motion to Suppress Physical Evidence at 3 n.3. But the search of the residence rested on a warrant, executed before the search, whose validity Silvers didn't challenge in his various motions to suppress. *See* Motion to Suppress Physical Evidence at 3 n.3 ("Records disclosed in discovery indicate that a search warrant was issued at 8:44 pm on October 15, 2018, for the search of Wiser Drive, and executed that same day at 10:15 p.m.). Because Silvers failed to address the validity of that warrant, he forfeited that argument. *See United States v. Schumacher*, 611 F. App'x 337, 341 (6th Cir. 2015).

At the suppression hearing, however, Silvers appeared to argue for the first time that the warrant to search his Wiser Drive residence was also invalid: "the connection … between the crimes that Mr. Silvers is accused of" and "the searches of … Wiser Drive" primarily come from allegedly involuntary "statements" that Silvers made. Hearing Tr. 126:25–127:06. This fruit-of-the-poisonous-tree argument fails because Silvers's statements were not obtained in violation of his constitutional rights and because Silvers pointed to nothing in the warrant that was problematic.

Indeed, Silvers didn't point to the Wiser Drive warrant at all.  No one has cited it in the record—presumably because Silvers didn't put it at issue until the suppression hearing.  And in any event, even if Silvers had placed the warrant before the Court, it's hard to imagine a magistrate judge lacking ample basis to issue a warrant for the residence based on the facts of this case.  Silvers stood accused of two shootings, gun offenses, and domestic-violence charges.  He was staying at the Wiser Drive apartment, at least in part, because of an emergency domestic violence order that required Silvers to vacate the home he and Brittney previously shared—which was also the scene of the shooting.

Regardless, as discussed above, Agents Laferte and Mullins *also* obtained Silvers's consent to search his residence on Wiser Drive approximately twenty minutes after obtaining Silvers's consent to search his cell phone.  *See* Motion to Suppress Physical Evidence at 2 (citing FBI Interrogation Audio Disk 1 8:25–28, 34:48–55).  Again, nothing in the record indicates this consent was invalid.  *See* Government Exhibit 3 (Consent to Search Form).  So for the same reasons Silvers's consent to search his cell phone was voluntary, his consent to search Wiser Drive was too.

### D. Vehicle

Defense counsel offered little else to challenge the search of Silvers's car, in which he was found at the crime scene.  The same lack-of-consent argument once again fails.  *See* Hearing Tr. 66:21–22 (Silvers gave agents permission to search Chrysler); Government Exhibit 3 (Consent to Search Form).  And at the hearing, Silvers apparently abandoned his challenge to the search warrant: "I believe the Government obtained a search warrant for the vehicle itself.  We're not challenging that."  Hearing Tr. 25:21–25.  So Silvers waived that argument "by expressly conceding it at the suppression hearing." *United States v. Holland*, 522 F. App'x 265, 273 (6th Cir. 2013).

Even if he hadn't, he'd fail on the merits.  The agents had ample basis for the warrant to search the car.  The warrant for the vehicle provides more than enough facts to establish probable cause to search the vehicle even without any purportedly invalid statements.  *See* Affidavit to Search Vehicle (DN 182-3) at 34–35.

## CONCLUSION

For these reasons, as well as those offered during the suppression hearing, Silvers's motions to suppress his statements and the Government's evidence fail.

Benjamin Beaton, District Judge

United States District Court

March 15, 2023

31