# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# PADUCAH DIVISION

**UNITED STATES OF AMERICA**                                                        **PLAINTIFF**

v.                                                  **NO. 5:18-CR-50**

**VICTOR EVERETTE SILVERS**                                         **DEFENDANT**

\* \* \* \* \*

## OPINION & ORDER

Is the U.S. Army base at Fort Campbell, Kentucky under federal jurisdiction? And in a federal criminal case, does the judge or the jury answer that question?

These two queries are raised by the United States' motion to take judicial notice that "4217 Contreras Court, Apartment F," where the conduct at issue in this case occurred, is "a place within the special maritime and territorial jurisdiction of the United States." Motion for Judicial Notice (DN 184) at 2 (quotation marks omitted).

The jurisdictional status of Fort Campbell is important to this Court, which hears all manner of cases arising from Fort Campbell.[1] That status is also important to this case, which concerns charges that Victor Silvers traveled to the base and committed several serious offenses on post. The federal murder, attempted-murder, firearm, and domestic-violence charges against him (Counts 1–5) all allege that these offenses occurred within the federal government's "special maritime and territorial jurisdiction." *See, e.g.*, 18 U.S.C. § 1111(b) (criminalizing murder committed within the special maritime and territorial jurisdiction of the United States); Second Superseding Indictment (DN 239) at 1–2 (charging that these five offenses occurred at Fort Campbell, a place within "the special maritime and territorial jurisdiction of the United States"). And 18 U.S.C. § 7(3) defines the "special maritime and territorial jurisdiction" to include "lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof."

The United States' trial proof included evidence that the alleged crimes "took place on the Fort Campbell, Kentucky military installation, at and in the immediate vicinity of 4217 Contreras Court, Apartment F, Fort Campbell, Kentucky." Motion

---

[1] Recent Fort Campbell cases litigated in the Western District of Kentucky address offenses such as the theft of federal property, *United States v. Morava*, No. 5:18-mj-1; possession of drug paraphernalia, *United States v. Sherman*, No. 5:18-mj-8; non-domestic assault, *United States v. Fanene*, 5:18-mj-21; and DUI, *United States v. Henrich*, 5:18-po-48.

1

at 2. The jury considered (among other things) whether the events took place at that street address. *See* Jury Instructions (DN 281) at 6. According to Silvers, however, the Sixth Amendment of the U.S. Constitution required the jury to also decide whether this portion of Fort Campbell is part of the designated federal jurisdictional territory. The Government, in contrast, urged the judge rather than jury to decide (or at least instruct) that 4217 Contreras Court is part of the special maritime and territorial jurisdiction of the United States.

Before trial, the Court granted Silvers's request for an evidentiary hearing and then largely granted the Government's motion regarding Fort Campbell's jurisdictional status. The Court instructed the jury on the *legal* status of the locus of the crime: "4217 Contreras Court is located within the special maritime and territorial jurisdiction of the United States." *Id.* And the Court asked the jury to answer the *factual* question whether it found "beyond a reasonable doubt that the crime occurred at 4217 Contreras Court." *Id.* The jury answered yes and convicted Silvers on all seven counts.

The Court now offers this supplemental opinion to explain the basis for its ruling in greater detail.

**A. Whose law applies?** This motion and the defense's opposition don't raise the question whether state rather than federal criminal statutes apply to the alleged murder and attempted murder on post. At least not directly. On a day-to-day basis, no one doubts that federal (including Army) laws and regulations control. The defense offers no affirmative argument to call this state of affairs into question. Nor does it contend, as a factual matter, that the Contreras Court address falls outside the boundaries of Fort Campbell as a matter of geography. Hearing Transcript (DN 292) at 20:23–21:16.

But the defense maintains that the Government hasn't established (or couldn't establish) beyond a reasonable doubt the prerequisites of special maritime and territorial jurisdiction, which turn on legal documents and decisions made generations ago. The land that comprises Fort Campbell was not federally controlled before World War II—at least not as the collective territory we know today. During the war years, the United States acquired various plots in Kentucky and Tennessee for use in the war, cobbling them together into what was once Camp Campbell and is now Fort Campbell. Hearing Tr. at 30:04–31:19; Gov't Exs. 2–3, 8.

Counterintuitively, perhaps, the acquisition of land or exercise of control by the U.S. government does not create even a presumption that federal jurisdiction applies there. "Although some may assume that a military installation automatically comes within Federal jurisdiction, that assumption is incorrect." *United States v. Williams*, 17 M.J. 207, 211 (C.M.A. 1984). Indeed, since 1940, federal law "presume[s] that jurisdiction has *not* been accepted." 40 U.S.C. § 3112 (formerly 40 U.S.C. § 255)

(emphasis added).² So the United States doesn't exercise jurisdiction over all land it owns or controls within the several states; sometimes the feds have the status of mere landowners or proprietors. *See United States v. Davis*, 726 F.3d 357, 364 (2d Cir. 2013) (citing *Paul v. United States*, 371 U.S. 245, 264 (1963)).³

Overcoming this presumption of state control and establishing federal jurisdiction depends on a two-step process: the state must agree to the transfer of jurisdiction and the federal government must accept jurisdiction. *See* § 3112(b); *Paul*, 371 U.S. at 264. The state must provide "consent to, or cession of, any jurisdiction." § 3112(b). And the head of a federal agency ("or other authorized officer…") indicates acceptance of jurisdiction by filing a notice with the Governor or following any other process set out in the State's laws. *Id.*

Establishing state relinquishment and federal acceptance is not always obvious. This determination "is often complex," and "federal courts can get the jurisdictional analysis wrong." *United States v. Banks*, No. 20-50175, 2022 WL 3278942, at *4 (9th Cir. Aug. 11, 2022) (Koh, J., concurring). Indeed, federal courts have on several occasions held that federal jurisdiction did *not* apply at federal institutions on federally owned land. *See Davis*, 726 F.3d at 364 (collecting cases). And courts of appeals have rejected jury instructions that merely ask, for example, whether the alleged offense "occurred in a federal prison on federal land." *Id.* at 361, 365. Such an instruction, as explained above, asks the wrong question. And as explained below, it also asks the wrong decisionmaker.

**B. Who decides?** The defense urges the Court to adopt an outlier position not supported by any precedent cited in these proceedings. No judge, it would appear, has tasked a jury with answering the question whether a particular plot is part of federal jurisdiction based on the legal sufficiency of state accession and federal acceptance under § 3112(b). Indeed, the pattern jury instructions of five circuits follow a different distinction that resonates with common-sense notions about the roles of judge and jury: lay jurors determine where acts occurred as a matter of fact

---

² Section 3112(b) provides:

> When the head of a department, agency, or independent establishment of the Government, or other authorized officer of the department, agency, or independent establishment, considers it desirable, that individual may accept or secure, from the State in which land or an interest in land that is under the immediate jurisdiction, custody, or control of the individual is situated, consent to, or cession of, any jurisdiction over the land or interest not previously obtained. The individual shall indicate acceptance of jurisdiction on behalf of the Government by filing a notice of acceptance with the Governor of the State or in another manner prescribed by the laws of the State where the land is situated.

³ Silvers concedes the property in question "is situated on Fort Campbell" and owned by the United States. Opp. at 2 n.1. He also accepts that Kentucky ceded jurisdiction over the property before 1954. *Id.* at 3 n.2.

while the judge decides the legal status (state or federal) of that location.[4] Under the two-prong test introduced above, the latter determination depends on the time and manner of the state's purported relinquishment and the United States' purported acceptance of the land in question.

A consistent body of caselaw mirrors these instructions. Although the Sixth Circuit lacks a pattern instruction for these special-jurisdictional offenses, three of its decisions have committed to the judge the question whether jurisdiction has transferred from a state to the federal government.

Most recently, in *United States v. Gabrion*, the court of appeals interpreted the word "jurisdiction" in 18 U.S.C. § 7 to refer to a sovereign's "legislative jurisdiction"—in other words, the federal government's "authority … to make its law applicable to persons or activities" at a particular spot. 517 F.3d 839, 845 n.5 (6th Cir. 2008). The court then held that the crime occurred within the federal government's territorial jurisdiction based on the status of the national forest where the jury found the crime occurred. *Id.* at 848.

In *United States v. Booth*, a Sixth Circuit panel described as "a legal issue, not a factual issue," the question "whether [the] United States Naval Air Station" where the charged crime was committed was "within the special maritime and territorial jurisdiction of the United States." 936 F.2d 573, 1991 WL 119530, at *6 (6th Cir. 1991) (table). The court affirmed the district court's direct instruction to the jury that the Naval Air Station *was* within our special maritime and territorial jurisdiction. *Id.* at *5–6.

And in *United States v. Blunt*, the Sixth Circuit stated (without much explanation) that a "district court would have been correct in taking judicial notice under Rule 201, Federal Rules of Evidence, of the fact that the Federal Correctional Institution" in Lexington "was within the territorial jurisdiction of the United States." 558 F.2d 1245, 1247 (6th Cir. 1977). *See also United States v. Harris*, 331 F.2d 600, 601 (6th Cir. 1964) ("The District Court may take judicial notice of established geographical facts.").

Other circuits are in accord. Judges rather than juries have determined, for example, whether Fort Leavenworth or the Blue Ridge Parkway are part of the federal maritime and territorial jurisdiction. *See United States v. Miller*, 499 F.2d

---

[4] Seventh Cir. Crim. Pattern Jury Instructions at 598; Eighth Cir. Crim. Pattern Jury Instructions at 351–52 (stating that "the issue of federal jurisdiction is a question of law to be determined by the court," but allowing that a judge may nevertheless include a jury instruction related to this point); Ninth Cir. Crim. Pattern Jury Instructions at 370–71 (*but see United States v. Read*, 918 F.3d 712, 718 (9th Cir. 2019) (describing existence of federal jurisdiction as element of § 113(a) to be proved to the jury)); Tenth Cir. Crim. Pattern Jury Instructions at 188–89; Eleventh Cir. Crim. Pattern Jury Instructions § O45.2 at 2.

736, 739 (10th Cir. 1974); *United States v. Lavender*, 602 F.2d 639, 641 (4th Cir. 1979). And whether the town of Cherokee, North Carolina, is found within the Cherokee Indian Reservation. *See United States v. Lossiah*, 537 F.2d 1250, 1251 (4th Cir. 1976); *see also United States v. Cook*, 922 F.2d 1026, 1031 (2d Cir. 1991) (cataloguing holdings that the question whether a crime occurred in Indian country is a matter of law for the court). And whether the federal prisons in Brooklyn and Raybrook, New York are part of the special maritime and territorial jurisdiction. *Davis*, 726 F.3d at 366; *United States v. Hernandez-Fundora*, 58 F.3d 802, 812 (2d Cir. 1995). And whether the U.S. Medical Center for Federal Prisoners is within the special federal jurisdiction. *United States v. Love*, 20 F.4th 407, 412 (8th Cir. 2021).

It's easy enough to imagine a different rule, in which prosecutors and defense lawyers put on evidence of legal ownership and control for lay jurors to weigh. But the complexity and unfamiliarity of the "proof" offered during the pretrial hearing in this case illustrates the daunting task that would await jurors in the alternative universe proposed by the defense. Do aging legal documents—such as land titles and agency filings—establish whether a particular letter or deed or order (or combination thereof) was legally effective in transferring state jurisdiction to the federal government at a particular plot of land? As discussed below, that determination turns on repeated correspondence between the Secretary of War and Governor of Kentucky, circa 1942. For better or worse, precedent has consistently decided against tasking lay jurors with this fundamentally legal assignment. *See Getty Petroleum Marketing v. Capital Terminal Co.*, 391 F.3d 312, 331–32 (1st Cir. 2004) (Lipez, J., concurring) (discussing the impracticality of jury deliberations over legal questions otherwise subject to judicial notice); *cf. United States v. Durham*, No. 3:21-cr-12, 2023 WL 1926893, at *11–12 (W.D. Ky. Feb. 11, 2023) (discussing similar challenges in the Armed Career Criminal context). And these administrability concerns are compounded by the interest in consistent rulings on the jurisdictional status of federal property—a determination that should be uniform rather than case-specific in order to avoid uncertainty and inconsistency regarding law-enforcement and prosecutorial actions. *See Love*, 20 F.4th at 412.

Rather than citing any specific judicial authority to the contrary, Silvers appeals generally to the *Apprendi* and *Gaudin* decisions assigning fact-finding duties to juries under the Sixth Amendment. Hearing Tr. 47:20–24; Opposition (DN 209) at 10. But *Apprendi* dealt with factual determinations about elements of criminal offenses, not legal questions about federal jurisdiction. 530 U.S. 466, 469 (2000). And *Gaudin* held only that in false-statement prosecutions the element of "materiality" is a mixed question of law and historical fact for the jury. 515 U.S. 506, 518–19 (1995). These decisions did not address judicial notice of "legislative facts," such as those relating to "geography and jurisdiction." *Davis*, 726 F.3d at 367 (quoting *Landell v. Sorrell*, 382 F.3d 91, 135 n.24 (2d Cir. 2002)); *see also United States v. Styles*, 75 F. App'x 934, 935 (5th Cir. 2003) (*Apprendi* "had no effect on whether the district court could take judicial notice" of the jurisdictional status of a federal hospital). Silvers asks the Court to treat these opinions, which address related but distinct questions,

as tacitly overruling longstanding authority rejecting judicial notice of legislative facts.

**C. Judicial Notice of Legislative Facts.** The jurisdictional status of a particular location on federal property is just such a legislative fact: an "established truth, fact, or pronouncement that does not change from case to case but applies universally," rather than a fact "developed in a particular case." *Davis*, 726 F.3d at 366 (cleaned up). Legislative facts are ones of which a judge may take notice independent of a jury. Here, the Government asked the Court to take notice of the jurisdictional status of Fort Campbell and instruct the jury that "the alleged crimes took place within the Special Maritime and Territorial Jurisdiction of the United States" if the jury found that the charged conduct took place at 4217 Contreras Court. Motion at 9. This is consistent with the Sixth Circuit's approval of judicial notice, since *Apprendi*, to establish that a crime occurred within the special maritime and territorial jurisdiction of the United States. *See Gabrion*, 517 F.3d at 848.

The best reading of the governing caselaw is that judicial notice of jurisdictional status is a question of legislative fact, not a so-called "adjudicative fact" that judges may notice, if at all, under Federal Rule of Evidence 201. *See Marshall v. Bramer*, 828 F.2d 355, 357 (6th Cir. 1987) ("Federal Rule of Evidence 201, which treats judicial notice, 'governs only judicial notice of adjudicative facts.'") (quoting FED. R. EVID. 201(a)). An adjudicative fact is one that addresses "the particular event which gave rise to the lawsuit and … help[s] explain who did what, when, where, how, and with what motive and intent." 2 MCCORMICK ON EVIDENCE § 328 (8th ed.). Because notice of adjudicative facts follows Rule 201, and notice of legislative facts does not, the procedures to take notice differ. *See, e.g.*, *Davis*, 726 F.3d at 367 ("[A] 'legislative fact' … may be judicially noticed without being subject to the strictures of Rule 201."). The most salient difference, at least for present purposes, is that in a federal criminal case the judge advises the jury that it *may* find an adjudicative fact established: "In a criminal case, the court must instruct the jury that it may or may not accept the noticed fact as conclusive." FED. R. EVID. 201(f).

"[W]hether a location falls within the 'special maritime and territorial jurisdiction of the United States' is a 'legislative fact' not controlled by Rule 201." WRIGHT & MILLER, 21B Fed. Prac. & Proc. Evid. § 5103 (2d ed.). The circuits that have considered this issue have largely allowed judicial notice of jurisdictional status outside of Rule 201. *See, e.g., Love*, 20 F.4th at 411–12 (jurisdictional status is a legislative fact not subject to Rule 201 requirements); *Davis*, 726 F.3d at 367–68 (same). Indeed, five circuits' pattern jury instructions allow for judicial determination of jurisdictional status. Seventh Cir. Crim. Pattern Jury Instructions at 598 (18 U.S.C. §§ 1111–12) (jurisdictional status determined by judicial notice); Eighth Cir. Crim. Pattern Jury Instructions, Committee Commentary, at 348, 352 (§ 7) (jurisdictional status is a matter of law determined by the court); Ninth Cir. Crim. Pattern Jury Instructions, Committee Commentary, at 370–71 (§ 1111) (same); Tenth Cir. Crim. Pattern Jury Instructions at 189 (§ 1111) (instructing that charged

6

location is within jurisdiction); Eleventh Cir. Crim. Pattern Jury Instructions § O45.2 at 2 (same).[5]

Consistent with this treatment, courts have addressed unproven, or even *unraised*, legislative facts on appeal by judicial notice outside the bounds of Rule 201. *See, e.g., Davis*, 726 F.3d at 367–68; WRIGHT & MILLER § 5110.1.[6] Such questions often concern "non-evidence facts," such as those implicating venue, to which Rule 201 doesn't apply. WRIGHT & MILLER § 5103; *United States v. Robinson*, 858 Fed. App'x 627 (4th Cir. 2021) (no obligation under FED. R. EVID. 201(f) to charge jury with deciding whether to accept judicially noticed fact regarding venue). And whatever weight one gives to the Rule 201's advisory note, which in places reads more like a blurb for Professor Davis's law-review articles than a normal advisory comment, it also supports this approach: "Adjudicative facts are simply the facts of the particular case. Legislative facts, on the other hand, are those which have relevance to legal reasoning and the lawmaking process...." FED. R. EVID. 201 advisory committee's note (1972). If nothing else, this discussion underscores the distinction between legislative and adjudicative facts—only the latter of which is governed by Rule 201.

While the Sixth Circuit precedent is less than crystal clear, it supports taking notice of jurisdictional status without a submission to the jury. Two of the decisions cited above, *Gabrion* and *Booth*, reflected judicial notice of a location's jurisdictional status without submission to the jury—that is, as a matter of legislative rather than adjudicative fact. And the circuit has elsewhere noted that Rule 201 applies to adjudicative facts only, and has cautioned that judicial notice should generally not be used to establish the governing law in a case. *See Toth v. Grand Trunk R.R.*, 306 F.3d 335, 349 (6th Cir. 2002). *Blunt*, described above, did invoke Rule 201—but merely held that the trial judge wouldn't have erred in taking judicial notice under that provision. 558 F.2d at 1247. This earlier opinion didn't address, much less reject, the longstanding custom of taking judicial notice of legislative facts such as

---

[5] To be sure, some decisions go the other way, describing jurisdictional determination as one of "adjudicative fact" under Rule 201. *See, e.g., United States v. Anderson*, 528 F.2d 590, 591–92 (5th Cir. 1976) (court could take judicial notice under Rule 201 that FCI-Tallahassee is within the special territorial jurisdiction of the United States). But these opinions tend not to confront the adjudicative/legislative distinction, perhaps grabbing Rule 201 off the rack as the only codified variety of judicial notice on offer. And other courts have called into question whether the jurisdictional status of rather more obscure locations is appropriate for judicial notice at all. *See United States v. Bello*, 194 F.3d 18, 22–23 (1st Cir. 1999) (expressing doubt that any "reasonable person" has ever heard of MDC-Guaynabo, let alone knows its jurisdictional status as within the special maritime and territorial jurisdiction of the United States).

[6] *See, e.g., United States v. Johnson*, 738 Fed. App'x 798, 799 (4th Cir. 2018); *United States v. Tisdale*, 7 F.3d 228 (4th Cir. 1993) (table); *United States v. Gaither*, 83 F.3d 416 (4th Cir. 1993) (table); *United States v. Bowers*, 660 F.2d 527, 530–31 (5th Cir. 1981); *United States v. Styles*, 75 Fed. App'x 934, 935 (5th Cir. 2003).

these. This governing caselaw is therefore consistent with the out-of-circuit precedent noticing jurisdictional status as a matter of legislative fact.

### D. Is Fort Campbell within the United States' Special Maritime and Territorial Jurisdiction?

As noted earlier, § 3112 requires the Government to show that the state agreed to transfer jurisdiction and the federal government accepted that transfer. Based on the Court's review of the arguments, record, and testimony offered in connection with this motion and at the pretrial hearing, the Government has satisfied § 3112's two prongs here. Its witness, James Phillips, explained that 4217 Contreras Court is located on a parcel acquired by the United States under the War Powers Condemnation Act in 1942. *See* Gov't Exs. 2–5; Hearing Tr. at 9:06–10:20. And the Government provided documentary evidence showing both state consent and federal acceptance.

The first prong is uncontested: Silvers didn't resist the Government's position that Kentucky consented to federal jurisdiction over the lands comprising the military base at Fort Campbell. Opp. at 3 n.2. And for good reason: Kentucky's consent is straightforward, statutory, and undisputed. K.R.S. § 3.010 states that the "Commonwealth of Kentucky consents to the acquisition by the United States of all lands and appurtenances in this state, by condemnation, gift or purchase, which are needful to their constitutional purposes, but said acquisition shall not be deemed to result in a cession of jurisdiction by this Commonwealth." Courts—including the U.S. Supreme Court—have recognized that § 3.010 (and its predecessor, § 2376 of Carroll's Kentucky Statutes) is legally effective in supplying the Commonwealth's consent to federal jurisdiction. *See Howard v. Commissions of Sinking Fund of City of Louisville*, 344 U.S. 624, 625 (1953) (addressing the jurisdictional status of a naval ordnance plant in Louisville).

As to the second, the Government's documents indicate that the Secretary of War repeatedly accepted federal jurisdiction over Camp Campbell and other federal areas acquired for military purposes before April 1945. Records show that the United States paid $26,233 to acquire approximately 325.10 acres on May 5, 1942 from Ella S. Ledford. *See* Deed to Tract 4C-16 (DN 184-5); 1942 Att'y Gen. Letter to Sec. of War (DN 184-1); War Dept. Distribution of Purchase Title Papers (DN 184-4). These "4C-16" documents show that the United States acquired the land at Contreras Court for military purposes.

And other documents show that the Secretary of War accepted jurisdiction over these and all other lands in Kentucky acquired for military purposes. Fort Campbell alone measures approximately 36,000 acres in Kentucky—in addition to considerably more in Tennessee. *See* Motion for Judicial Notice (DN 184) at 3 n.3. The Secretary of War and Governor didn't exchange correspondence in response to each individual acquisition, opting instead to state their positions categorically. Then-Secretary Henry Stimson sent a letter to Kentucky Governor Simeon Willis accepting "exclusive jurisdiction over all lands acquired by [the United States] for military purposes

8

within the Commonwealth of Kentucky, title to which has heretofore vested in the United States and over which exclusive jurisdiction has not heretofore been obtained." April 28, 1945 Stimson Letter (DN 184-6) (judicial acceptance letter maintained in Army Corps of Engineer files).

The Government also introduced an essentially identical letter, from August 3, 1945, communicating the same acceptance of exclusive jurisdiction over all federally acquired lands where jurisdiction hadn't already been specifically accepted. August 3, 1945 Stimson Letter (DN 184-7) (letter from Secretary of War Stimson to Governor Willis). Why two similar letters mere months apart? The records and testimony indicate this was a belt-and-suspenders approach by the War Department: similar letters accepting exclusive jurisdiction were sent by Stimson to Willis and his predecessor in March 1943, January 1944, and May 1944.[7] Contrary to Silvers's suggestion, these cumulative and consistent documents evincing broad acceptance of jurisdiction—extending from the 1940s to the 80s—support rather than undermine the Government's showing.

The only necessary logical step is a short one indeed. True, no letter states explicitly that the federal government accepts jurisdiction *specifically* over Plot 4C-16 in Christian County. Unsurprisingly, the United States instead speaks in the aggregate: accepting jurisdiction over *all* lands acquired for military purposes. And the other documents listed above show that the United States did in fact acquire Plot 4C-16 for military purposes. No argument or document presented to the Court suggests that shouldn't suffice under 40 U.S.C. § 3112.

In response, the defense argues that these documents showing transfer and acceptance are inadmissible because they are unauthenticated, inadmissible hearsay, and violate the best evidence rule. Opp. 5–7.[8] These evidentiary principles are likely inapplicable in this context because the ordinary rules of evidence do not apply to determinations of law or judicial notice of legislative facts. According to the Advisory Committee, "the judge is unrestricted in his investigation and conclusion" related to "judicial access to legislative facts …. render[ing] inappropriate any limitation in the

---

[7] *See* Gov't Ex. 8 (Revised Jurisdiction Summary for Fort Campbell, Kentucky and Tennessee) (January 17, 1985), Ex. 9 (Revised Jurisdiction Summary, Fort Campbell, Kentucky and Tennessee) (December 5, 1975); Ex. 11 (Letters from Stimson to Willis dated April 28, 1945, August 3, 1945, and January 3, 1944 and to Governor Keen Johnson dated March 19, 1943); *see also* Exs. 13–14 (similar records maintained at Blue Grass Army Depot, rather than Fort Campbell, evincing federal intent in 1943 to accept federal jurisdiction over Kentucky lands acquired for military purposes). These letters formed the basis of a judicial finding in the Eastern District of Kentucky that the Blue Grass Army Depot was a federal enclave for purposes of federal question jurisdiction. *See Watkins v. Safety-Kleen Systems, Inc.*, No. 5:08-cv-224, 2008 WL 4073554, at *4–5 (E.D. Ky. 2008).

[8] The defense also indicated that it would raise a Confrontation Clause challenge, but did not set out any such argument in the response brief. *See* Opp. at 2. So this argument is abandoned. *See United States v. Watson*, 716 F. App'x 499, 502 (6th Cir. 2017).

form of indisputability … and any requirement of formal findings…." FED. R. EVID. 201 advisory committee (1972) (quotations omitted); *see also* 1 MUELLER & KIRKPATRICK, Fed. Evid. § 2:12 (4th ed.) ('[T]he Rules do not regulate … any aspect of noticing legislative facts"); *cf.* FED. R. EVID. 1101(d) (evidence rules "do not apply to … court's determination, under Rule 104(a), on a preliminary question of fact governing admissibility … and miscellaneous proceedings….").

In any case, Silvers's evidentiary objections fail on their merits.

As to hearsay, the Government's custodial witness—Charlie Effinger—demonstrated that the Army Corps of Engineers maintained these titles and letters as part of standard military recordkeeping practice. Hearing Tr. at 22:25–26:12, 28:21–23. And the various governmental entities created these documents at the time of the transfer as part of their regular course of record-keeping. Based on the documents and testimony considered at the jurisdictional hearing, these are commonplace files kept for decades in the ordinary course by the U.S. Army Corps. So these documents are excluded from the rule against hearsay under FED. R. EVID. 803(6). *See, e.g., United States v. Pacheco*, 466 F. App'x 517, 523–24 (6th Cir. 2012) (admitting regularly-kept FDIC record under 803(6)).

As to the best-evidence rule, the only basis for such a challenge is that the original letters must be provided. FED. R. EVID. 1002; Opp. at 4–8. But the Government has presented photocopies of the original Stimson letters and sale documents. And "duplicate[s]" are "admissible to the same extent as the original unless a genuine question is raised about the original's authenticity." FED. R. EVID. 1003. Based on the Court's review of the testimony and objections, the defense has raised no serious doubts about the authenticity of these documents, which appear regular, official, and mutually reinforcing. The Court harbors no real doubts (and cannot imagine any explanation) that the documents are not what they purport to be.

As to authenticity, the Government has presented testimony from a custodian that these records come from a public office where official papers are kept. Hearing Tr. at 22:25–26:12, 28:21–23 (testimony of Effinger); Reply at 2–3 (discussing source of records). So the records are presumed authentic. FED. R. EVID. 901(7) (evidence that public record is regularly kept supports authenticity); MCCORMICK ON EVID. § 226; *see also United States v. Lopez*, 762 F.3d 852, 862 (9th Cir. 2014) (testimony of custodial officer sufficient to certify authenticity of public record). The defense offers no compelling evidence to the contrary. Counsel pointed to differences between these letters (DNs 6 & 7) and others sent by Henry Stimson. *See* Hearing Tr. 42:07–18, 51:05–11 (parsing letterhead and signatures used in Stimson correspondence). But none show differences between these and other *acceptance* letters sent by Stimson as the Secretary of War. That these letters bear different letterhead than a small selection of other letters, or contain typed or traced rather than handwritten signatures, does not create any serious concern that they are forgeries or inauthentic in some other way. Opp. at 7–8 (comparing Defense Ex. 3). Some of these differences are slight or imperceptible, and arguably support rather than undermine the letters'

authenticity. *See GE Franchise Commercial LLC v. Wormsby*, 2016 WL 4181192, at *4 (D. Ariz Aug. 8, 2016).[9]

Other differences between various documents are similarly insignificant. Two exhibits—6 and 7—were substantively identical letters from Stimson to Willis, though they contained different dates and different modes of state acknowledgement. Silvers identifies nothing of import to be drawn from the difference between acceptance by seal versus signature. The upshot of each is identical: the Secretary of War accepted jurisdiction over all lands in Kentucky acquired for military purposes.[10]

## Conclusion

For these reasons and those discussed during the pretrial hearing, the Court granted the Government's motion that the Court take judicial notice that 4127 Contreras Court at Fort Campbell, Kentucky, is within the special maritime and territorial jurisdiction of the United States.

Benjamin Beaton, District Judge
United States District Court

March 30, 2023

---

[9] At argument defense counsel cited neighboring Kentucky statutes, K.R.S. §§ 3.090 and 3.100, which purportedly cast doubt on the reliability of the Commonwealth's relinquishment and the United States' acceptance of jurisdiction. Hearing Tr. at 51:05–24. These statutes, nowhere mentioned in Silvers's papers, do not appear to have been passed until 1954—*after* state relinquishment and federal assumption of jurisdiction. *See* K.R.S. § 3.090 ("effective June 17, 1954"). Counsel nevertheless implied that the Governor may not have properly transmitted the United States' request to the next session of the General Assembly or published the Commonwealth's acceptance. This suspicion apparently rests on the absence of a section of the Kentucky Revised Statutes (3.010-.110) specifying that Kentucky ceded jurisdiction over Fort Campbell. No material in the record, however, indicates that the Governor violated or then-existing state law created any such procedural requirement. Nor do these statutory citations, without more, call into question the accuracy or effectiveness of the 1940s records the Government relies on.

[10] Alternatively, Silvers argued that even if the jurisdictional element were susceptible to judicial notice, the Court should've declined because the Government has failed to show that the jurisdictional status of Fort Campbell "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Opp. at 1–2 (citing Fed. R. Evid. 201(b)(2)). In response, the Court held a thorough pretrial hearing to allow the defense to air all its potential objections. As discussed below, however, Silvers didn't identify any countervailing evidence or flaws in the Government's submissions sufficient to call into question the accuracy and ascertainability of Fort Campbell's jurisdictional basis.