UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION

UNITED STATES OF AMERICA                                    PLAINTIFF

v.                                                   NO. 5:18-cr-50-BJB

VICTOR EVERETTE SILVERS                                      DEFENDANT

* * * * *

OPINION & ORDER

Victor Silvers was federally indicted and convicted for possessing a gun despite a state-court domestic-violence order that told him not to. That order issued after he grabbed his estranged wife by the neck, punched her, and threatened her with his gun. The criminal statute, 18 U.S.C. § 922(g)(8), prohibits gun possession by anyone who, after notice and a hearing, has been found a credible threat to the physical safety of, or ordered not to use or threaten physical force against, an intimate partner or child. This restriction, according to Silvers, violates the U.S. Constitution.

The lawfulness of Silvers's conviction turns on whether the Second Amendment, as publicly understood when ratified, would've barred the government from disarming someone in his position. Silvers offers no real argument or precedent indicating that this constitutional provision (or its state analogues or common-law precursors) ever defeated the criminal prosecution or civil disarmament of someone determined to be a credible threat to the safety of others. Nor has Silvers pointed to any deficiency in the underlying state-court proceeding or order, which cited § 922(g)(8) and expressly commanded him not to possess a gun.

Is Silvers's total (if temporary) disarmament reconcilable with the constitutional right "to keep and bear arms"? The Second Amendment's apparent tension with § 922(g)(8) renders the statutory restriction presumptively unlawful under the Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2126 (2022). Viewed in the light of its historical context and the country's tradition of firearm regulation, however, *id.* at 2131, the scope of the constitutional right doesn't shield persons found to be dangerous from laws restricting their possession of firearms.

"The historical evidence," then-Judge Barrett explained in a pre-*Bruen* dissent concerning a different subsection of § 922(g), "support[s]" the "propositio[n] that the legislature may disarm those who have demonstrated a proclivity for violence or

1

whose possession of guns would otherwise threaten the public safety." *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (abrogated by *Bruen*, 142 S. Ct. 2111).   Other judges—considering similar statutes and a similar historical record—have reached the same conclusion.    "Historically, limitations on the right were tied to dangerousness.   In England and colonial America, the Government disarmed people who posed a danger to others.   Violence was one ground for fearing danger, as were disloyalty and rebellion." *Folajtar v. Att'y Gen. of the United States*, 980 F.3d 897, 913 (3d Cir. 2020) (Bibas, J., dissenting) (also abrogated by *Bruen*).   "The most cogent principle that can be drawn from traditional limitations on the right to keep and bear arms," another opinion described at length, "is that dangerous persons likely to use firearms for illicit purposes were not understood to be protected by the Second Amendment." *Binderup v. Att'y Gen. of the United States*, 836 F.3d 336, 357 (3d Cir. 2016) (Hardiman, J., concurring) (also abrogated by *Bruen*).   This history of laws used to "disarm dangerous and disaffected persons" reaches back to pre-colonial English history.   Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 NOTRE DAME L. REV. 397, 405 (2019).

The Government is wrong to argue that the Second Amendment didn't apply to Silvers at all.   He, like other members of our political community protected by the Bill of Rights, enjoyed a right to keep and bear arms.   But that right was not unlimited. *Bruen*, 142 S. Ct. at 2128.   As historically understood, it did not dislodge traditional governmental authority to restrict his gun possession based on the dangerous threat he posed to his now-deceased wife.   Section 922(g)(8), like other laws familiar at or before the Second Amendment's ratification, restricted Silvers for a limited period of time following due process and individual findings of danger to others.   This measure looks nothing like the broad and historically anomalous bans addressed in the Supreme Court's Second Amendment trilogy of *Heller*, *McDonald*, and *Bruen*.   Consistent with those precedents, the Amendment's text and history indicate that "legislatures have the power to prohibit dangerous people from possessing guns," and did in fact "disqualif[y] categories of people from the right to bear arms"—though "only when they judged that doing so was necessary to protect the public safety." *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting).

## I.    Victor and Brittney Silvers

Before her death in 2018, Brittney Silvers served as a sergeant in the U.S. Army and lived on post at Fort Campbell, Kentucky.   After seven years of marriage, she and her husband, Victor Silvers, had recently separated.   That summer, Brittney drove to Clarksville, Tennessee—where Victor had been living since leaving their apartment—to find Victor.    Around 1:00 a.m. on July 22, a Clarksville law-enforcement officer responded after Brittney and Victor "got into a verbal argument" and Victor "grabbed her by her neck with one hand and struck her in the face twice

with his other hand." Incident Report (DN 255-1) at 3. The officer "observed blood on Britt[ney] Silvers' lips and her face appeared to be swollen," *id.*, as shown in a photo found in the police report, DN 255-2 at 4.

An officer secured an arrest warrant against Victor Silvers for domestic assault later that morning. Incident Report at 3. And the next day Brittney sent a text message asking Victor to "[t]hink about all the times you put your hands on me." *Id.* "I'm just fed up," she wrote. *Id.*

Officers arrested and jailed Victor in Montgomery County, Tennessee for domestic assault on September 22. DN 255-2 at 2. He was released on bail the same day. *See* Order Granting Bail (DN 255-4). As a condition of his release, the state court prohibited Victor from "harassing, annoying, telephoning, contacting or otherwise communicating" with Brittney, and ordered him to "vacate" and "stay away" from her home. *Id.*

Victor and Brittney nevertheless exchanged several text messages that night and the following day. Victor asked her whereabouts and demanded that she answer his calls. DN 255-6 at 2–3. "Please don't come near me," Brittney answered. "I don't feel safe." *Id.* at 1. Victor asked if she was at the house of a man Victor suspected she was seeing, and then wrote "Never mind found you!" *Id.* Once more Brittney responded: "Please don't come near me[.] I don't feel safe." *Id.*[1]

Three days later Brittney petitioned the Christian County (Ky.) Circuit Court for an order of protection. DN 255-7 at 1. The petition stated that "my spouse Victor Silvers assaulted me and threatened me with his gun." *Id.* (cleaned up). The state court issued an emergency protective order. DN 255-8. Victor received service on October 1 of a protective-order summons, later found at his house in Clarksville, notifying him of an October 9 hearing date at Christian County Circuit Court. *See* DN 255-10. Silvers "didn't go" to the hearing "on purpose," as he told Brittney in a subsequent text message. DN 255-13 at 2–3.

After the hearing, the state court issued a domestic-violence order against Silvers. *See* DVO (DN 255-11) at 1. The judge found "by a preponderance of the evidence that an act or threat of domestic violence occurred and may occur again," that a "weapon" had been "involved," and that Silvers was "Armed and Dangerous." *Id.* at 1, 3. The court ordered that Silvers "be restrained from committing further

---

[1] The federal-court record includes abundant evidence that Silvers told others he wanted to kill Brittney. The parties introduced and discussed this evidence (relevant to multiple counts) at length during trial, and it appears in the pre-sentence investigative report as well. *See, e.g.*, PSR (DN 307) at ¶ 46 (text from Victor to a girlfriend that Brittney "betrayed me on a level to where I want her dead!!!!!"). Less clear is whether and how much of this information was before the state-court judge who issued the domestic-violence order.

acts of abuse or threats of abuse, stalking, or sexual assault," and from any "unauthorized contact" with Brittney. *Id.* at 1. "In order to assist in eliminating future acts of domestic violence and abuse," moreover, the judge ordered Silvers "not to possess, purchase or attempt to possess, purchase or obtain a firearm or ammunition during the duration of this order," specifically citing 18 U.S.C. § 922(g)(8). *Id.* at 2. The order didn't expire until October 2021—though Kentucky law allows for reconsideration*, see Castle v. Castle*, 567 S.W.3d 908, 914 (Ky. Ct. App. 2019) (citing KY. R. CIV. P. 52.02 & 59.05), and permits either party to move to amend an order of protection, *see* KRS § 403.745(5); *Abdur-Rahman v. Peterson*, 338 S.W.3d 823, 825 (Ky. Ct. App. 2011) (discussing KRS § 403.750).

Silvers received notice of this order, too. *See* DN 255-13 at 4–6. Officers later discovered pictures of the order on his phone; Brittney had sent the images via text message. DN 255-14 at 4–6.

Five days after the state court issued the DVO, Brittney died. She was shot in her head, neck, and chest. Off-duty soldiers who lived nearby heard the gunshots and ran to her apartment. They found Brittney stretched out in the yard, a male friend bleeding nearby, and Victor locked inside his car screaming.

## II.    This Prosecution

Because these crimes occurred at Fort Campbell, part of the United States' "special maritime and territorial jurisdiction," 18 U.S.C. § 7; *see* DN 316, the federal government investigated and prosecuted them. A federal grand jury sitting in Paducah, Kentucky, charged Victor Silvers with committing seven offenses, including first-degree murder, attempted murder, and—relevant here—carrying a firearm while subject to a DVO in violation of § 922(g)(8). The Government initially sought the death penalty, DNs 75, 116, but later withdrew the request, DN 113.

On the eve of trial, the Government issued a second superseding indictment, though it added no charges to the counts facing Silvers. DN 239. In response he moved to dismiss the § 922(g)(8) charge. Relying on the Supreme Court's recent decision in *Bruen*, he argued that the federal statute violates the Second Amendment. Given the complexity and importance of the parties' arguments, and the minimal evidentiary impact that dismissal would have given the overlapping nature of the conduct at issue in the other six counts, the Court deferred ruling on the motion until after the verdict.

Following a six-day trial, the jury found Silvers guilty on all seven counts. The Government offered abundant evidence, apart from the gun and DVO, that led the jury to convict Silvers on the other six counts—one of which carried a mandatory life sentence, another of which required a consecutive ten-year sentence, and three of which authorized sentences of imprisonment up to life.

### III.   Section 922(g)(8)

The federal Gun Control Act of 1968 prohibits firearm possession by individuals who fall into several categories, including convicted felons, fugitives, drug addicts, and persons who have been committed to a mental institution. *See* § 922(g)(1)–(4). Congress amended that statute in 1994 to introduce a new category, § 922(g)(8), covering individuals subject to some DVOs. Violent Crime Control and Law Enforcement Act, Pub. L. No. 103-322, § 110401(c), 108 Stat. 1796, 2014–15. Section 922(g)(8), the Sixth Circuit has held, "reflects Congress's determination that persons subject to domestic violence protection orders pose an increased threat to the safety of their intimate partners and children." *United States v. Baker*, 197 F.3d 211, 216 (6th Cir. 1999). This provision, the court went on, reflected Congress' "conclu[sion] that keeping firearms away from such individuals represents a reasonable step toward reducing" that threat. *Id.*

Section 922(g)(8) applies if three conditions exist:

(1) a court issues an order after the individual receives notice and an opportunity to be heard;

(2) the order restrains the individual from "harassing, stalking, or threatening an intimate partner or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child"; and

(3) the order "includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child" or "explicitly prohibits the use, attempted use, or threatened use of physical force … that would reasonably be expected to cause bodily injury."

18 U.S.C. § 922(g)(8). A person subject to an order that meets these criteria may not possess a firearm.

The jury found Silvers guilty of violating § 922(g)(8). The Government's evidence showed, first, that on the day Brittney died, Victor was subject to a court order issued after notice and a chance to be heard. Second, the order "restrained" him "from committing further acts of abuse or threats of abuse" and "from any unauthorized contact with" Brittney. DVO at 1. Third, the order found that "an act or threat of domestic violence occurred and may occur again." *Id.* at 3. Indeed, for purposes of this motion, Silvers doesn't dispute that § 922(g)(8) properly applies to him as a factual and statutory matter. *See* Reply at 1 n.1. Rather, his motion to dismiss relies solely on the argument that the Second Amendment bars the federal government from prosecuting him for possessing a weapon while subject to the state-court DVO.

## IV.   The Second Amendment

Did § 922(g)(8) infringe Silvers's right to keep and bear arms by criminalizing his possession of a gun while under the domestic-violence order?   The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." The statute at issue undoubtedly affected Silvers's ability to keep arms, as commonly understood at ratification and today.   And contrary to the Government's argument, Silvers is a member of "the people" covered by this constitutional provision.   That means he is presumptively protected by the Second Amendment.   *See Bruen*, 142 S. Ct. at 2134–35.   Whether § 922(g)(8) infringes that protection, however, turns on the Second Amendment's public meaning as informed by this country's history and tradition of gun rights and restrictions.   *Id.* at 2135.

**1. "To keep and bear Arms."**   The charged offense rests on Silvers's mere possession (not use or even transport) of a weapon.   This restriction plainly implicates his ability to "keep" arms, which simply means his right "to 'have weapons.'"   *See District of Columbia v. Heller*, 554 U.S. 570, 583 (2008) (citing NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) (reprinted 1989)).   The Second Amendment presumptively protects the right of individual citizens to possess a handgun in the home for purposes of self-defense.   *Heller*, 554 U.S. at 635.   The Supreme Court reached that conclusion after evaluating the Amendment's text, historical background, and post-ratification history.   These sources, the Court held, rendered the Second Amendment right incompatible with a District of Columbia law that completely banned the possession of handguns in the home.   *Id.*

Other blanket restrictions have met the same fate.   The Chicago ordinance at issue in *McDonald v. City of Chicago*, like the law in *Heller*, "effectively bann[ed] handgun possession by almost all private citizens who reside[d] in the City."   561 U.S. 742, 750 (2010) (plurality op. of Alito, J.).   Although that decision addressed state regulation under the Fourteenth Amendment rather than federal regulation under the Second, the Court held that the right recognized in *Heller* is "deeply rooted in this Nation's history and tradition."   *Id.* at 768 (quotation marks omitted).

*Bruen* itself rejected a law that permitted an individual "to carry a handgun for self-defense outside the home" only at the grace of state officials.   142 S. Ct. at 2122.   The New York law in question "condition[ed] issuance of a license to carry on a citizen's showing of some additional special need" and "pro[of] that proper cause exists."   *Id.* at 2122, 2123 (quotation marks omitted).   This regime conflicted with the "plain text" and historical understanding of the Second Amendment, which protects "'bear[ing]' arms in public for self-defense."   *Id.* at 2135, 2156.

"When the Second Amendment's plain text covers an individual's conduct," as is the case here, the *Bruen* Court held that "the Constitution presumptively protects

that conduct." *Id.* at 2129–30.  The weapon at issue, a handgun, is indisputably a weapon "in common use," whose possession may have a "lawful purpose." *Heller*, 554 U.S. at 627–28.  Presumably recognizing this, the Government doesn't maintain that § 922(g)(8), as applied to Silvers, triggers "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'" that the Supreme Court has recognized as congruent with the Second Amendment right.  *Id.* at 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939), and 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 148–49 (1769)).

   **2. "The people."**  Instead, the Government raises a different threshold objection.  The Second Amendment offers Silvers no protection, it contends, because persons subject to the sort of domestic-violence order covered by § 922(g)(8) are not among "the people" whose gun rights are guarded by the Second Amendment.  "*Heller* and *Bruen*," the argument goes, "defined the right to bear arms as belonging to 'law-abiding, responsible' citizens."  Response (DN 255) at 10 (quoting *Heller*, 554 U.S. at 635, and *Bruen*, 142 S. Ct. at 2156).  Those in Silvers's position are purportedly not "ordinary," "responsible" or "law-abiding," because in "most circumstances … the conduct that led to the protective order constitutes an assault, battery, or criminal threat."  Response at 10–11 (citing *Bruen*, 142 S. Ct. at 2122).

   This "is an unusual way of thinking about rights."  *Kanter*, 919 F.3d at 452 (Barrett, J., dissenting).  It's far more natural to conceive of the Bill of Rights as presumptively protecting each of us—unless and until a law validly restricts those rights.  A felon, for example, loses a right (such as the right to vote) only if he is convicted *and* the government has enacted a law that takes that right away.  *See id.* at 453.  This is one reason why trial judges taking guilty pleas emphasize to defendants the non-criminal consequences—loss of the right to vote, serve on a jury, possess a gun, and so forth—of a first felony conviction.  *See, e.g.*, Federal Judicial Center, BENCHBOOK FOR U.S. DISTRICT COURT JUDGES § 2.01 (6th ed. 2013).  These are rights the defendants previously enjoyed but stood to lose.  A person could become "*eligible* to lose" a right by violating the law.  *Kanter*, 919 F.3d at 453.  But that person's conduct alone didn't "automatically" cost him or her that right without some further operation of law.  *Id.*

   This provision, it's worth remembering, codified a preexisting right: "the Amendment acknowledges '*the* right ... to keep and bear Arms,' a right that pre-existed the Constitution like '*the* freedom of speech.'"  *Parker v. District of Columbia*, 478 F.3d 370, 382 (D.C. Cir. 2007) (alteration in original), *aff'd sub nom. Heller*, 554 U.S. 570.  By ensuring that the new national government would continue to respect such natural- and common-law rights, the Amendment preserved the status quo for "all members of the political community" subject to the Constitution—rather than bestowing a novel right on "an unspecified subset" of the nation.  *United States v. Rahimi*, 61 F.4th 443, 451 (5th Cir. 2023) (quoting *Heller*, 554 U.S. at 580).

*Heller* explained that "the people" refers to "all Americans." 554 U.S. at 581. In this Amendment, and elsewhere, the Constitution's invocation of "the people" "unambiguously refers to all members of the political community." *Id.* at 580. If "[n]either felons nor the mentally ill" "are categorically excluded from our national community," *Kanter*, 919 F.3d at 453 (Barrett, J., dissenting), then why would those subject to a DVO?

No one would read the First or Fourth Amendments in the way the Government reads the Second. Yet it attempts to persuade judges to interpret shorthand passages from the lengthy opinions in *Heller* and *Bruen* as one would parse a legal code. This is unconvincing. "Judicial opinions," after all, "must not be confused with statutes." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc). The phrases the Government quotes from *Heller* and *Bruen* reflect, rather than create, limits on the holdings of those opinions. Disclaimers about "the matters [that] have been left open," *id.*, don't relieve judges and litigants of the "legal heavy lifting," *id.* at 646 (Sykes, J., dissenting), necessary to examine the historical justifications for those "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," *Heller*, 554 U.S. at 626–27. *Cf. United States v. McCane*, 573 F.3d 1037, 1047–48 (10th Cir. 2009) (Tymkovich, J., concurring) ("express[ing] concern that the dictum inhibits lower courts from exploring the contours of *Heller* and its application to firearm restrictions"). "*Heller*," these decisions make clear, "does not resolve this case on its own terms." *Tyler v. Hillsdale County*, 837 F.3d 678, 687 (6th Cir. 2016) (en banc).

The Government offers no countervailing historical support for the proposition that individuals subject to a domestic-violence order (or any historical analogue) automatically fall outside the scope of the Second Amendment. And given this record, the absence of any supporting post-*Bruen* decision from the Government's brief is telling—if not terribly surprising. The overwhelming and consistent sway of precedent runs in the opposite direction. Many courts analyzing § 922(g)(8) in the wake of *Bruen* have rejected the Government's theory.[2] The same goes for many courts that have addressed the Government's "law-abiding citizen" argument with respect to other § 922(g) provisions.[3] *Bruen* and *Heller* didn't focus on whether the petitioners were "responsible" and "law-abiding"—though the opinions used those

---

[2] *See Rahimi*, 61 F.4th at 451–53; *United States v. Combs*, No. 5:22-cr-136, 2023 WL 1466614, at *2–3 (E.D. Ky. Feb. 2, 2023); *United States v. Kays*, No. 22-cr-40, 2022 WL 3718519, at *2 (W.D. Okla. Aug. 29, 2022); *United States v. Perez-Gallan*, No. 22-cr-00427, 2022 WL 16858516, at *8–9 (W.D. Tex. Nov. 10, 2022).

[3] *See United States v. Rowson*, No. 22-cr-310, --- F. Supp. 3d ----, 2023 WL 431037, at *15–16 (S.D.N.Y. Jan. 26, 2023) (collecting cases).

8

terms.  Rather, the Court focused on whether the Amendment's "plain text covers an individual's *conduct*" subject to regulation. 142 S. Ct. at 2126 (emphasis added). *See United States v. Rowson*, No. 22-cr-310, --- F. Supp. 3d ----, 2023 WL 431037, at *15 (S.D.N.Y. Jan. 26, 2023).  Certainly the Supreme Court's recent Second Amendment trilogy hasn't endorsed the exclusionary view of "the people" now advanced by the Government.

Pre-*Bruen* Sixth Circuit precedent, moreover, arguably forecloses that argument.  In *Tyler v. Hillsdale County Sheriff's Dep't*, the court of appeals rejected the notion that the Second Amendment leaves "categorically unprotected" citizens who have been involuntarily committed.  837 F.3d at 688–90 (asking "whether those people … fall completely outside the reach of the Second Amendment").  And even in upholding a neighboring provision—§ 922(g)(9)—against constitutional challenge, *Stimmel v. Sessions* recognized that "[b]y acknowledging that 'law-abiding, responsible citizens' are at the core of the Amendment's protections, the *Heller* Court presumed certain individuals *can be* 'disqualified' from exercising Second Amendment rights."  879 F.3d 198, 203 (6th Cir. 2018) (emphasis added).  In other words, such people did not simply lack any Second Amendment rights in the first place.   So Silvers remains with the scope of "the people" addressed by the Amendment.

**3. History and Tradition.**  The relevant question, then, "is whether the government has the power to disable the exercise of a right that [the people] otherwise possess, rather than whether they possess the right at all." *Kanter*, 919 F.3d at 453 (Barrett, J., dissenting).  That authority turns on whether the legal restriction is consistent with the constitutional text, viewed in its historical context.

**a.** The premise of *Heller* and *Bruen* is that the Second Amendment right retains an intelligible and justiciable scope, even if its contours are by now somewhat obscured by time and pre-*Heller* practice.  Examining how others understood the right's application over time—in other words, the history and tradition of the Second Amendment in our laws and practice—will "frequently provide evidence of original meaning." Randy E. Barnett & Lawrence B. Solum, *Originalism after* Dobbs*,* Bruen*, and* Kennedy*: The Role of History and Tradition*, 128 Nw. L. Rev. (forthcoming 2023) (manuscript at 55), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4338811.

Justice Thomas's opinion in *Bruen* accordingly framed the inquiry into the contours of that right as a "presumption" that restrictions are invalid. *See* 142 S. Ct. at 2129–30.  This focus on historical applications of the text aligns with the Court's previous acknowledgment that, "like most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 2128 (quoting *Heller*, 554 U.S. at 626).  It also aligns with the basic textualist insight that the original public meaning of legal language encompasses both content and scope: "like a vector," a legal provision "has

length as well as direction." Frank H. Easterbrook, *The Role of Original Intent in Statutory Construction*, 11 HARV. J.L. & PUB. POL'Y 59, 63 (1988). So the *Bruen* opinion went on to assess whether the Government could overcome that presumption by demonstrating that a "regulation … is consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2130. "Only then," *Bruen* instructed, "may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49 n.10 (1961)).

This "historical tradition" includes the regulations enacted by the states and federal government in the era of the Amendment's ratification.[4] "[W]hether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Id.* at 2132 (quoting Cass Sunstein, *On Analogical Reasoning*, 106 HARV. L. REV. 741, 773 (1993)). The Government, however, needn't identify a "historical *twin*"; a "well-established historical *analogue*" will suffice. *Id.* at 2133. The *Bruen* Court directed courts toward two ways to ascertain whether a historical regulation is "relevantly similar" to a modern one: "how" and "why" the particular "regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33 (considering "whether modern and historical regulations impose a comparable burden on the right to armed self-defense" and "whether that burden is comparably justified"). The question here, as the Fifth Circuit recently framed it, is whether Silvers "forfeited his Second Amendment rights [because] his conduct ran afoul of a 'lawful regulatory measure[]' 'prohibiting … the possession of firearms,' *Heller*, 554 U.S. at 626–27 & 627 n.26, that

---

[4] The parties don't raise and this opinion needn't resolve whether the authorities cited here and in related decisions constitute evidence of contemporary usage, or instead of the "liquidation" of the meaning of contested applications of the right, or further still of "living traditionalist" consideration of later political practice. *See* Sherif Girgis, *Living Traditionalism*, 98 N.Y.U. L. REV. (forthcoming 2023) (manuscript at 12), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4366019 (citing William Baude, *Constitutional Liquidation*, 71 STAN. L. REV. 1, 4 (2019)). Nor is the temporal question regarding the relevance of Bill of Rights versus Reconstruction practice and usage implicated here, as the Second Amendment's applicability to a federal criminal statute enacted by Congress doesn't depend on incorporation against the states. *See Bruen*, 142 S. Ct. at 2162–63 (Barrett, J., concurring); *see also id.* at 2138 (maj. op.) (citing AKHIL AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION xiv, 223, 243 (1998)). The sources pertinent to this Court's interpretation all are close enough in time to the Second Amendment's ratification and then-existing legal content that they bear on the public meaning available to the ratifiers. *Id.* at 2163; Barnett & Solum, *Originalism after* Dobbs*,* Bruen*, and* Kennedy, at 36. "[P]ost-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text" naturally "cannot overcome or alter that text." *Bruen*, 142 S. Ct. at 2137 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)).

is consistent with 'the historical tradition that delimits the outer bounds of the right to keep and bear arms,' *Bruen*, 142 S. Ct. at 2127." *Rahimi*, 61 F.4th at 454–55.

The Sixth Circuit has not applied this methodology to a similar § 922(g) provision—at least not directly and not since the Supreme Court handed down *Bruen*. Previously the court of appeals upheld § 922(g)(8) as constitutional on the understanding that "the Second Amendment does not create an individual right." *United States v. Napier*, 233 F.3d 394, 403 (6th Cir. 2000). *Heller*, of course, directly contradicts *Napier*'s rationale. *See* 554 U.S. at 595. So *Napier* doesn't control given this inconsistent higher authority. *See United States v. Elbe*, 774 F.3d 885, 891 (6th Cir. 2014).

And in what appears to be the Sixth Circuit's only extended historical analysis of a § 922(g) provision after *Heller*, the en banc court vacated a panel decision that had characterized the support for § 922(g)(4) (barring guns for those previously committed to a mental institution) as "inconclusive." *See Tyler v. Hillsdale County Sheriff's Dep't*, 775 F.3d 308, 319–22 (6th Cir. 2014), *rev'd en banc*, 837 F.3d 678.[5] Meanwhile, the Sixth Circuit's 2018 decision upholding § 922(g)(9), which prohibits gun possession by domestic-violence misdemeanants, applied a species of means-end scrutiny that *Bruen* rejected: the restriction survived so-called "intermediate scrutiny" based on the Government's contemporaneous justifications, despite the opinion's assumption that, "as historically understood," a "domestic violence misdemeanant's Second Amendment rights remain intact to some degree." *Stimmel*, 879 F.3d at 205, 211. The court didn't ask whether the scope of the right to keep and bear arms at ratification would've tolerated a federal proscription of firearm

---

[5] After *Heller*, the courts of appeals adopted a two-step test for determining whether a statute passes constitutional muster under the Second Amendment. *See, e.g.*, *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (collecting cases). Under that approach, now obsolete following *Bruen*, courts would first ask "whether the challenged law burdens conduct that falls within the scope of the Second Amendment right, as historically understood." *Id.* If it didn't, then the analysis ended, as "the regulated activity is categorically unprotected." *Id.* If the conduct *did* burden activity within the Second Amendment's scope, then courts would generally apply "intermediate scrutiny" and analyze "the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." *Id.* (quotation marks omitted).

possession by domestic-violence misdemeanants. *See id.* at 207–11.[6] So no binding precedent is directly on point.[7]

**b.** The Government maintains that § 922(g)(8) is analogous to laws that disarmed "dangerous" people and "surety" statutes (which also concerned dangerous people). *See Bruen*, 142 S. Ct. at 2148 (surety statutes "typically targeted only those threatening to do harm"). Its historical evidence ranges from 17th-century English statutes to Reconstruction-era laws. Silvers responds, predictably, by attempting to distinguish these and related laws as not "relevantly similar" under *Bruen*. But his historical accounting addresses only one side of the ledger: he tallies historical differences without considering the similarities. This is incomplete. As *Bruen* recognized, "[e]verything is similar in infinite ways to everything else," so one needs "some metric enabling the analogizer to assess which similarities are important and which are not." *Id.* at 2132 (quoting Frederick Schauer & Barbara A. Spellman, *Analogy, Expertise, and Experience*, 84 U. CHI. L. REV. 249, 254 (2017)). What is necessary is a principle that fits the historical examples to the governing text—a regression to make sense of the raw data.

Fortunately judges examining § 922(g) today aren't the first to confront this material. As Judge Bibas wrote in a related context, "[t]he history of felon disarmament is well canvassed by Judge Hardiman's concurrence in *Binderup*, 836

---

[6] In *United States v. Burgess*, the Sixth Circuit held that § 2D1.1(b)(1) of the United States Sentencing Guidelines, which provides a sentence enhancement for those who possessed a firearm in connection with a drug offense, is constitutional post-*Bruen*. Nos. 22-1110/22-1112, 2023 WL 179886, at *5 (6th Cir. Jan 13, 2023). But previous Sixth Circuit precedent, *Greeno*, 679 F.3d at 520, had upheld that provision as consistent with the Amendment's original scope under step one of the pre-*Bruen* test. And step one of that test, the Supreme Court subsequently recognized, "is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Burgess*, 2023 WL 179886, at *5 (quoting *Bruen*, 142 S. Ct. at 2127).

[7] Both the Third Circuit and Eighth Circuit, pre-*Bruen* but post-*Heller*, upheld § 922(g)(8) as consistent with history and tradition, irrespective of any means-end scrutiny analysis. *See United States v. Boyd*, 999 F.3d 171, 185–88 (3d Cir. 2021) (rejecting as-applied challenge because the defendant could not "distinguish himself from the class of presumptively dangerous persons who historically lack Second Amendment protections"); *United States v. Bena*, 664 F.3d 1180, 1184 (8th Cir. 2011) (rejecting facial challenge because "[i]nsofar as § 922(g)(8) prohibits possession of firearms by those who are found to represent 'a credible threat to the physical safety of [an] intimate partner or child,' it is consistent with a common-law tradition that the right to bear arms is limited to peaceable or virtuous citizens" (second alteration in original) (citation omitted)). The Fifth Circuit, on the other hand, in a post-*Bruen* decision, held § 922(g)(8) unconstitutional, concluding that it is an "outlier[] that our ancestors would never have accepted." *Rahimi*, 61 F.4th at 461 (alteration in original) (quoting *Bruen*, 142. S. Ct. at 2133). Those out-of-circuit decisions deserve this Court's careful attention even though they are not binding.

F.3d at 367–74, as well as then-Judge Barrett's dissent in *Kanter*, 919 F.3d at 453–64." *Folajtar*, 980 F.3d at 914.  Judge Bibas's own thorough dissent certainly adds to that account.  What becomes apparent is that the Government's position rests on a historical principle that Silvers lacks: These three opinions' "analyses show that the limit on the Second Amendment right was pegged to dangerousness." *Id.*

Judge Hardiman's partial concurrence in *Binderup* concluded that "the right to keep and bear arms was understood to exclude those who presented a danger to the public." 836 F.3d at 368.  That en banc case involved a challenge to § 922(g)(1) as applied to defendants who had committed nonviolent offenses.  *Id.* at 356–57 (majority opinion) (§ 922(g)(1) invalid under intermediate scrutiny as applied to defendants not previously convicted of a "serious" crime).  The statute violated the Second Amendment, Judge Hardiman's concurrence concluded, with respect to defendants who had "presented unrebutted evidence that their offenses were nonviolent and now decades old, and that they present no threat to society." *Id.* at 379.  Judge Hardiman drew the "dangerous persons" principle from ratifying-convention proposals, English laws, colonial loyalty-oath statutes, and related scholarship.  Those materials, he determined, showed that the Second Amendment guaranteed a right to possess weapons for non-violent felons, but *not* for "people who have demonstrated that they are likely to commit violent crimes." *Id.* at 370.

This "[h]istory," Judge Barrett's dissent in *Kanter* explained, "support[s] the proposition that the state can take the right to bear arms away from a category of people that it deems dangerous." 919 F.3d at 464.  That case, like *Binderup*, addressed whether the federal felon-in-possession statute, § 922(g)(1) (as well as its Wisconsin analogue, Wis. Stat. § 941.29(1m)), violated the Second Amendment as applied to a defendant who had previously been convicted of mail fraud. The majority held those laws constitutional under intermediate scrutiny, declining to resolve whether all felons, as opposed to only dangerous ones, may be disarmed by the government. *Kanter*, 919 F.3d at 447, 451.  Judge Barrett's dissent, on the other hand, demonstrated that "[h]istory is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns." *Id.* at 451.  She reached this conclusion after reviewing numerous founding-era legal sources (many cited by the Government here) shedding light on the contemporaneous public meaning of the right to keep and bear arms: state ratifying-convention proposals, England's Militia Act of 1662, prohibitions against going "armed to terrify" the public, colonial "loyalty" laws disarming classes of people who refused to swear an oath of allegiance or were otherwise perceived as potential threats to public order (often on a groupwide basis—covering "Catholics," "slaves, [or] Native Americans"— in a manner now rightly perceived as odious), and historical scholarship. *See id.* at 454–58. The category of "dangerous people" these laws addressed, moreover, includes individuals "who have not been convicted of felonies." *Id.* at 454.  The key is a person's

13

"demonstrated … proclivity for violence" or conduct showing that "possession of guns would otherwise threaten public safety." *Id.*

And in *Folajtar*, another decision involving an as-applied challenge to § 922(g)(1), this time by a defendant previously convicted of tax fraud, Judge Bibas's dissent agreed that "[t]he historical touchstone is danger." 980 F.3d at 912. Citing the separate opinions just discussed, Judge Bibas considered English laws, American colonial laws that disarmed the supposedly disloyal, and proposals from state ratifying conventions. *Id.* at 913–15. He interpreted that record not to support a categorical disarmament of all felons. *Id.* Rather, the historical data supported the more limited proposition that "all citizens enjoyed" the right to keep and bear arms "unless they posed a danger." *Id.* at 924. And because "nobody claimed that" this particular defendant "posed a danger," Judge Bibas would've held § 922(g)(1) unconstitutional as applied to her. *Id.* (cleaned up).

**c.** A different subsection of § 922(g) is of course at issue in this case: one addressing persons barred from harassing or threatening an intimate partner or child based on a credible threat of violence. But the evidence on which the *Binderup*, *Kanter*, and *Folajtar* opinions rely is the sort of history and tradition that *Bruen* instructed judges to examine. 142 S. Ct. at 2130. And the Second Amendment principle that those three opinions teased out of the relevant history and tradition extends to this dispute. After all, *Bruen* emphasized that tradition and historical analogues are tools to uncover "the content of the pre-existing legal right to bear arms" protected by the text of the Second Amendment, not doctrinal requirements "*independen[t] of the original meaning* of the constitutional text." Barnett & Solum, *Originalism after* Dobbs*,* Bruen*, and* Kennedy, at 31–34 (emphasis in original).

Regardless of the rights the Second Amendment preserves for non-dangerous persons, therefore, it does not guarantee gun possession for persons demonstrated to be dangerous, as Victor Silvers had been in 2018. The historical record reveals laws that focus on dangerousness and whose features are analogous to § 922(g)(8). These analogues overcome the presumption recognized in *Bruen*, 142 S. Ct. at 2129–30, "inform the meaning of [the] constitutional text," *id.* at 2130, and establish "that dangerous persons likely to use firearms for illicit purposes were not understood to be protected by the Second Amendment," *Binderup*, 836 F.3d at 357 (Hardiman, J., concurring). So the federal government may, consistent with the constitutional text as understood at the time of its adoption, prohibit gun possession by those in Silvers's situation.

Three types of laws, described in the decisions and scholarship above, are pertinent to this historical inquiry.

*First*, "going-armed" laws known to the ratifying generation prohibited persons from "bearing arms in a way that spreads 'fear' or 'terror' among the people." *Bruen*,

14

142 S. Ct. at 2145.  "Colonial Massachusetts and New Hampshire," for example, "authorized justices of the peace to arrest 'all Affrayers, Rioters, Disturbers, or Breakers of the Peace, and such as shall ride or go armed Offensively ... by Night or by Day, in Fear or Affray of Their Majesties Liege People.'"  *Id.* at 2142–43 (ellipsis in original) (quoting 1692 Mass. Acts and Laws no. 6, pp. 11–12).[8]  Those statutes required offenders to forfeit their arms.[9]  Complementing the default common-law right to bear arms, *see Heller*, 554 U.S. at 599, these laws "codified [an] existing common-law offense of bearing arms to terrorize the people" recognized in 17th-century English caselaw.  *Bruen*, 142 S. Ct. at 2143; *see also Kanter*, 919 F.3d at 456–57 (Barrett, J., dissenting) (citing *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686)).  And they "were modeled after England's Statute of Northampton," which treatise writers understood to apply to a person who displayed an "'intention to commit a[n] Act of Violence or Disturbance of the Peace.'"  *Bruen*, 142 S. Ct at 2142–43 (quoting 1 WILLIAM HAWKINS, PLEAS OF THE CROWN 136 (1716)); *see also* 4 BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 144 (the "offence of *riding* or *going armed,* with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land").  Several states enacted similar laws in the late-18th century.[10]

*Second*, other ratification-era laws disarmed people feared to be disloyal.  *See Kanter*, 919 F.3d at 457–58 (Barrett, J., dissenting); *Folajtar*, 980 F.3d at 914 (Bibas, J., dissenting).[11]  "During the American Revolution, Massachusetts and Pennsylvania

---

[8] *See also* Acts and Laws of His Majesty's Province of New Hampshire in New England 17 (1771) (statute enacted in 1701).

[9] *See* 1 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay, 52–53 (1869) (1692 statute); Acts and Laws of His Majesty's Province of New-Hampshire 17 (1771) (1701 statute); Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force 33 (1794) (1786 statute) (forfeiture of "armour").  Massachusetts removed the law's forfeiture provision in 1795, while Virginia removed its forfeiture provision in 1847.  *See Rahimi*, 61 F.4th at 458.  That these commonwealths amended their laws to remove the forfeiture provision 4 and 56 years after ratification, respectively, doesn't necessarily suggest that they did so based on a view that forfeiture was inconsistent with the U.S. Constitution.  *See* Girgis, *Living Traditionalism*, at 21–25 (discussing potential reasons for shifting post-enactment political practices).  These changes post-dated ratification and preceded any understanding of the Bill of Rights to apply against the states.  *See Barron v. City of Baltimore*, 32 U.S. (7 Pet.) 243, 250–51 (1833).

[10] *See, e.g.*, Collection of All Such Acts of the General Assembly of Virginia 33 (1794) (statute enacted in 1786); 2 Laws of the Commonwealth of Massachusetts 653 (1807) (statute enacted in 1795).

[11] *See, e.g.*, 7 William Waller Hening, Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature 35–37 (1756) (1756 Virginia statute); 5 James T. Mitchell & Henry Flanders, Statutes at Large of Pennsylvania from 1682 to 1801, 627 (1898) (1759 Pennsylvania statute); An Act for the executing in the Colony of the

disarmed loyalists to the Crown who refused to swear allegiance to the state or the United States." *Folajtar*, 980 F.3d at 914. States implemented these laws because "[l]oyalists were [perceived as] potential rebels who were dangerous before they erupted into violence." *Id.* The restrictions echoed earlier colonial laws that "disarmed Catholics 'on the basis of allegiance, not on the basis of faith.'" *Id.* (quoting Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 LAW & HIST. REV. 139, 157 (2007)). This practice of categorically disarming groups of people reached back to England, which "disarmed Catholics" "because they were presumptively thought to pose a … threat." *Kanter*, 919 F.3d at 457. Even after the Glorious Revolution, when gun rights expanded thanks in part to the English Bill of Rights, the practice of disarming entire groups on grounds of dangerousness persisted. *See* O'Scannlain, 95 NOTRE DAME L. REV. at 405–06 (describing rewards the Crown offered for "seizing … arms of Papists, and other disaffected persons").[12]

*Third*, surety statutes required some individuals, including "those threatening to do harm," to post a "surety" (essentially a bond) "before carrying weapons in public." *Bruen*, 142 S. Ct. at 2148. This was "[o]ne means of conserving the peace, apart from prosecuting those who breached it." C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 HARV. J.L. & PUB. POL'Y 695, 717 (2009). When "an individual's carrying of arms," was, for example, "attended with circumstances giving just reason to fear that he purposes to make an unlawful use of them," another person enforcement had "sufficient cause to require him to give surety of the peace." *Bruen*, 142 S. Ct. at 2148 (quoting WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA 126 (2d ed. 1829)). "If he refused he would be liable to imprisonment." Marshall, 32 HARV. J.L. & PUB. POL'Y at 717 (quoting RAWLE, A VIEW OF THE CONSTITUTION 126). This practice originated in the common law and was codified by state governments after ratification of the Bill of Rights. *See, e.g.*, 4 BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 252; *Bruen*, 142 S. Ct. at 2148 & n.23 (identifying jurisdictions that enacted surety statutes post-ratification).

---

*Massachusetts-Bay*, in *New-England*, one Resolve of the *American Congress*, dated March 14, 1776, Massachusetts Session Laws (1776); 9 William Waller Hening, Statutes at Large; Being a Collection of all the Laws of Virginia, from the First Session of the Legislature 281–83 (1821) (1777 Virginia statute); 9 James T. Mitchell & Henry Flanders, The Statutes at Large of Pennsylvania from 1682 TO 1801, at 110–14 (1903) (1777 Pennsylvania statute).

[12] Several of those historical laws—particularly those categorically conditioning constitutional rights on religion, race, and ethnicity—would obviously be considered patently unconstitutional today for reasons independent of the Second Amendment. *See Kanter*, 919 F.3d at 458 n.7 (Barrett, J., dissenting).

These examples of how lawmakers and judges contemporaneously understood and applied the right to keep and bear arms trace several contours of the Second Amendment.

To begin, the "dangerousness" principle discussed in several § 922(g) decisions and historic precedents was familiar to the people who codified and ratified the right to keep and bear arms. As discussed above, contemporary and historic sources alike speak in terms of danger and fear: seizure of arms from those "dangerous to the Peace of the Kingdom," Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13; disarming "seditious loyalists" at the "advice of the Continental Congress to 'secure every person, who … might … endanger the safety of the colony,'" *Folajtar*, 980 F.3d at 914 (Bibas, J., dissenting) (quoting G.A. Gilbert, *The Connecticut Loyalists*, 4 AM. HIST. REV. 273, 281 (1899)); requiring "surety of the peace" if someone carried arms in "fear[ful]" manner, RAWLE, A VIEW OF THE CONSTITUTION 126, based on the "complaint of any person having reasonable cause to fear an injury," Mass. Rev. Stat., ch. 134, § 16 (1836).[13] These laws were widespread: numerous states enacted surety statutes, for example, which targeted "those threatening to do harm." *Bruen*, 142 S. Ct. at 2148. Indeed, *Bruen* itself identified 10 surety statutes over a broad period of time.[14] And similar language is found in English sources that predated ratification and informed the linguistic meaning and legal effect of the common-law right in the colonies and states. *See, e.g.* Militia Act of 1662; 7 William Waller Hening, Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature 35–37 (1756 Virginia statute) (anti-Catholic disarmament law) ("[W]hereas it is dangerous at this time ….") (cleaned up).

The consequence if someone posed a dangerous threat, under many such laws, was the limitation of the use and possession of arms. The going-armed laws, for example, allowed for the seizure of guns from and imprisoning of people who went "armed Offensively" with "intentions" of "[v]iolence" or to "[d]isturb" the "[p]eace." 1 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay, 52–53 (1869) (1692 statute); 1 HAWKINS, PLEAS OF THE CROWN 136. England's Militia Act of 1662 similarly permitted officers of the Crown to "disarm anyone they judged to be 'dangerous to the Peace of the Kingdom.'" *Kanter*, 919 F.3d at 456 (quoting 13 & 14 Car. 2, c. 3, § 13). To be sure, the abuses of this authority under the Stuart Kings to

---

[13] Underscoring both the importance of threatened violence and the limitations of the surety law, the Massachusetts statute included an exception that allowed those subject to a surety to carry if he had his own "reasonable cause to fear an assault." Mass. Rev. Stat., ch. 134, § 16 (1836).

[14] Mass. Rev. Stat., ch. 134, § 16 (1836); 1838 Terr. of Wis. Stat. § 16, p. 381; Me. Rev. Stat., ch. 169, § 16 (1840); Mich. Rev. Stat., ch. 162, § 16 (1846); 1847 Va. Acts ch. 14, § 16; Terr. of Minn. Rev. Stat., ch. 112, § 18 (1851); 1854 Ore. Stat. ch. 16, § 17, p. 220; D. C. Rev. Code ch. 141, § 16 (1857); 1860 Pa. Laws p. 432, § 6; W. Va. Code, ch. 153, § 8 (1868).

disarm political opponents led in part to a guarantee against disarmament (for some) in the English Bill of Rights.[15]   But the "provisions allowing search and seizure of weapons from disaffected persons remained in effect until it was repealed" (apparently "through mere inadvertency") in 1757.   O'Scannlain, 95 NOTRE DAME L. REV. at 406; *see* 15 WILLIAM COBBETT, THE PARLIAMENTARY HISTORY OF ENGLAND 738 (1808).   And American colonies similarly disarmed people perceived to be disloyal who therefore "posed a potential danger."   *NRA v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 200 (5th Cir. 2012) (abrogated by *Bruen*); s*ee also, e.g.*, *Folajtar*, 980 F.3d at 914 (Bibas, J., dissenting) ("To ensure peace and safety, the colonies had to disarm them.").

Proposals made in the Pennsylvania and Massachusetts ratifying conventions also demonstrate the familiarity of this "dangerousness" principle.   One proposal from Pennsylvania, which *Heller* described as "highly influential," 554 U.S. at 604, called for a guaranteed right to bear arms "*unless* for crimes committed, or real danger of public injury from individuals," 2 BERNARD SCHWARTZ, THE BILL OF RIGHTS: A DOCUMENTARY HISTORY 665 (1971) (emphasis added).   At the Massachusetts ratifying convention, Samuel Adams proposed language that would have guaranteed the right only to "peaceable citizens."   *Id.* at 681.   That proposal "would have disarmed those who caused physical disruptions and threatened public safety."   *Folajtar*, 980 F.3d at 915 (Bibas, J., dissenting).   True, the language from these proposals didn't make it into the Second Amendment and aren't historical analogues in the strictest sense.   But these sources retain value given that their language reflects contemporaneous notions of the scope of that right; they remain "evidence of the scope of founding-era understandings regarding categorical exclusions from the enjoyment of the right to keep and bear arms."   *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting).

Next, these historical analogues involved civil as well as criminal proceedings.   Although the going-armed laws were criminal prohibitions, the loyalty and surety laws had civil as well as criminal aspects.   They could be invoked by private individuals against people who had yet to be (or never would be) found guilty of a crime.   "Although [some] Loyalists were neither criminals nor traitors," for example, "American legislators had determined that permitting these persons to keep and bear arms posed a potential danger."   *NRA*, 700 F.3d at 200.   And a 1759 Pennsylvania statute authorized justices of the peace to search the homes of any "reputed" Catholic if they "receive[d] information" or had "good cause" to "suspect the concealment of arms and ammunition."   5 James T. Mitchell & Henry Flanders, Statutes at Large of

---

[15] *See, e.g., Heller,* 554 U.S. at 592–93; *Tyler v. Hillsdale County Sheriff's Dep't,* 775 F.3d 308, 319 (6th Cir. 2014), *rev'd en banc,* 837 F.3d 678.   The English Bill of Rights provided "[t]hat the subjects which are Protestants may have arms for their defense suitable to their conditions and as allowed by law."   1 W. & M., c. 2, § 7, in 3 Eng. Stat. at Large 441 (1689).

Pennsylvania from 1682 to 1801, 627 (1898).  Surety statutes, moreover, "required only a civil proceeding, not a criminal conviction."  *Rahimi*, 61 F. 4th at 460.  A person could be required to give sureties—which if not complete prohibitions undoubtedly represented *some* restriction on the right to keep and bear arms[16]—on nothing more than the "complaint of any person having reasonable cause to fear an injury, or breach of the peace."  *E.g.*, Mass. Rev. Stat., ch. 134, § 16.  Reasonable cause or "'[p]robable ground' was primarily anticipatory, like a restraining order," though it could also be imposed following a criminal conviction.  Marshall, 32 HARV. J.L. PUB. POL'Y at 717.

The then-existing line between civil and criminal process and punishment, in any case, was not as clear or relevant as implied by Silvers's argument (to the extent he has raised it at all).  *See generally* Caleb Nelson, *The Constitutionality of Civil Forfeiture*, 125 YALE L.J. 2446, 2455 (2016) ("[C]enturies of practice support the idea that civil process can be used to declare the loss of property, even when that loss is punitive."); *id.* at 2496–2501 (disentangling "the criminal/civil distinction from the punitive/remedial distinction" as a matter of historical practice).  Surety statutes, for instance, represented a hybrid that involved civilly imposed restrictions that could be enforced by criminal prosecution.  English law at times authorized monetary rewards for confiscation of weapons.  *See* O'Scannlain, 95 NOTRE DAME L. REV. at 405–06.  And nothing in the founding-era precedents or examples cited here appears to have placed significant weight on whether a proceeding was civil or criminal in nature.  The historical examples cited by the Government required *legal*—not necessarily criminal—process.  *Heller*, after all, spoke to "regulatory measures" such as "longstanding prohibitions on the possession of firearms by … the mentally ill."  554 U.S. at 626–27 & n.26; *see also Tyler*, 837 F.3d at 686 (treating such measures as "presumptively lawful").  Nothing suggests this refers only to the criminally prosecuted and ignores civil commitment.  *See United States v. Boyd*, 999 F.3d 171, 186 n.11 (3d Cir. 2021).

And it's unclear why Silvers's civil disarmament following notice, hearing, and a judicial finding of danger would be more objectionable than his disarmament after indictment but before a judicial finding of guilt.  As others have recognized, "the government can detain and disarm, not just after conviction, but also before trial."  *Rahimi*, 61 F.4th at 464 (Ho, J., concurring).  Any such procedures, however labeled, must surely comport with separate due-process protections regarding notice, hearing, and decisionmaking in connection with the deprivation of valuable rights.  And the text of § 922(g)(8) itself imposes procedural safeguards on the DVO process before an

---

[16] *Cf. Bruen*, 142 S. Ct. at 2149.  As the Court noted, "two of the antebellum surety laws were unusually broad in that they did not expressly require a citizen complaint to trigger the posting of a surety."  *Id.* at 2148 n.24 (citing 1847 Va. Acts ch. 14, § 16; W. Va. Code, ch. 153, § 8 (1868)).

order is backed by the federal criminal proscription. So Silvers cannot escape the reach of § 922(g)(8) just because the underlying state-court order was civil rather than criminal in origin.

Although these founding-era examples may not represent historical twins of § 922(g)(8), *Bruen* doesn't require an identity of legislation. 142 S. Ct. at 2133. This makes sense: it's the Second Amendment whose content remains constant, not the statutes regularly enacted and amended by the people's elected representatives. By design, legislatures may alter the form and substance of laws—so long as they remain consistent with the Constitution. The unsurprising fact that the form of gun laws has changed over time shouldn't by itself cast doubt on their constitutionality; as a dissenting Justice Scalia observed in a related context, "[q]uite obviously, not every restriction upon expression that did not exist in 1791 or in 1868 is *ipso facto* unconstitutional." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 373 (1995). The question is instead "whether the government action under challenge is consonant with the concept of the protected freedom … that existed when the constitutional protection was accorded." *Id.* at 375. In this case, that means asking whether the statute's content remains consistent with the scope of the right to keep and bear arms. Legislators, of course, may validly "update" statutes in a manner forbidden to judges interpreting the Constitution. Anthony J. Bellia Jr. & Bradford R. Clark, *The Constitutional Law of Interpretation*, 98 NOTRE DAME L. REV. 519, 602–03 (2022).

Whatever the Government's burden for demonstrating the consistency between a statutory restriction and the Second Amendment right, the extensive evidence of the "dangerousness" principle exhumed by Judges Hardiman, Barrett, and Bibas surely suffices to overcome it. These going-armed, loyalty, and surety laws refute Silvers's position that the scope of the common-law right, as codified by the founding generation, privileges gun possession over the dangerous behavior and legal process underlying Silvers's DVO. Rather, our history and tradition show that a "firearms disability can be consistent with the Second Amendment to the extent that … its basis credibly indicates a present danger that one will misuse arms against others and … redresses that danger." Marshall, 32 HARV. J.L. PUB. POL'Y at 698.

The limitations Silvers faced are consistent with the relevant aspects of statutes and causes of action that coexisted with the historic right to keep and bear arms: they existed for a similar purpose (prevention of violence and terror) and acted through similar mechanisms (temporary disarmament in response to legal process and a judicial determination of dangerousness). *See Bruen*, 142 S. Ct. at 2132–33 (asking "how and why" historical laws burden the right to armed self-defense). The historical analogues, moreover, all reflect the same background presumption that the people generally have a right to keep and bear arms. *See, e.g.*, *Bruen*, 142 S. Ct. at 2148 ("[T]he surety statutes *presumed* that individuals had a right to public carry that could be burdened only if another could make out a specific showing of

reasonable cause to fear an injury, or breach of the peace.") (quotation marks omitted). Certainly the going-armed, loyalty, and surety laws resemble the targeted restrictions of § 922(g)(8) far more than the blunderbuss disarmament that preceded the English Bill of Rights, *see* O'Scannlain, 95 NOTRE DAME L. REV. at 402–03, or the "severe" and "outlier" restrictions at issue in *Heller*, 554 U.S. at 628, *McDonald*, 561 U.S. at 786, and *Bruen*, 142 S. Ct. at 2161 (Kavanaugh, J., concurring).

**4. Silvers's counterarguments are inconsistent with *Bruen* and the original meaning of the Second Amendment.** Despite this historical record, Silvers contends that the Government cannot show a historical law "distinctly similar" to § 922(g)(8). Its features, he maintains, differ from those of the analogues discussed above: § 922(g)(8) targets violence against a particular person (instead of the world at large), completely prohibits firearm possession (as opposed to prohibiting only public carry), and may require individuals to wait years to regain their guns (though he doesn't identify what length of time might be tolerably short).

*First,* he views the loyalty statutes as unanalogous because they were "motivated by a fear of insurrection and rebellion," whereas § 922(g)(8) "seeks to prevent interpersonal violence." Reply at 4–5. But "fear of insurrection and rebellion" surely encompasses fear of the violence that would bring; that's why the laws targeted gun possession as opposed to, say, seditious speech. And disarmament based on fear of threatened violence to a specific person (as opposed to general political heterodoxy) seems more rather than less appropriate; certainly § 922(g)(8) is more particularized than categorical disarmament of large groups of people based on stereotyped and generalized proclivities for dangerousness. If anything, this aspect of the loyalty statutes favors is the statute's constitutionality.

He also complains that the Government's brief identifies only three laws disarming "disloyal" people, which is purportedly "insufficient" to "establish a tradition." Reply at 4. But as shown above, more than three loyalty statutes were enacted in America. And in any event the relevant tradition and history includes other types of laws that disarmed dangerous people, not just a subset of those perceived to be dangerous based on disloyalty. So Silvers's emphasis on the Supreme Court's doubts that "*three* colonial regulations could suffice to show a tradition of public-carry regulation" misses the point. 142 S. Ct. at 2142. Many more than three laws reflect disarmament based on dangerousness.

*Second*, Silvers cannot overcome § 922(g)(8) on the ground that it proscribes gun possession both inside and outside the home. He argues that one set of laws discussed above—"going armed" laws—imposed a more limited burden on gun possession that is not commensurate to that of § 922(g)(8). These laws, Silvers emphasizes, banned only a "specific manner of carrying (to terrify), and only in public." Reply at 4. But that is not the sum total of their historical import. Most

important is the principle these going-armed laws reveal and the surety and loyalty statutes reinforce: that Second Amendment rights weren't absolute following a finding of dangerousness or threat. *See Binderup*, 836 F.3d at 369 (Hardiman, J., concurring). Many of the laws discussed above contemplated disarmament as well as more limited restrictions on use or possession.

*Third*, although Silvers is right that restrictions imposed under § 922(g)(8) may last more than a year, he is wrong that this presents a distinction of categorical or constitutional magnitude. The disability he faced was time-limited, individualized, and reminiscent of several aspects of the historical provisions discussed above. Even the loyalty statutes, though framed in group terms, operated on an individual level: persons could overcome the restriction by taking an oath of allegiance. The "threat dissipated when a person pledged his allegiance to the United States or to a particular state." *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting).[17] And although many post-ratification surety laws limited the amount of time they applied to a particular individual,[18] at common law a justice of the peace could require a person to give sureties potentially "for life." Marshall, 32 HARV. J.L. & PUB. POL'Y at 718 (quoting 1 HAWKINS, PLEAS OF THE CROWN 129). Silvers did not permanently lose his Second Amendment rights based on the DVO order he chose not to contest.

True, unlike some of those subject to loyalty laws, he could not regain his arms "at any time by swearing a loyalty oath." Reply at 4. But § 922(g)(8) is keyed to the duration of the DVO, which under Kentucky law is limited and subject to reconsideration. *See Castle*, 567 S.W.3d at 914 (motion to alter, amend, or vacate entry of DVO); KRS § 403.745(5) (parties may move to amend the order); *Abdur-Rahman*, 338 S.W.3d at 825–26 (Kentucky law "provides for the issuance, reissuance, and amendment of DVOs"). Silvers was slated to regain his rights after three years even if he did nothing to challenge the restriction in state or federal court. Someone who objected to the oath requirement, by contrast, could've theoretically been disarmed for life. Here, again, the relevant constitutional principle is a legal determination of dangerousness, not any free-floating temporal restriction (which Silvers hasn't identified in any event).

---

[17] *See, e.g.*, Act of June 13, 1777, *reprinted in* 9 James T. Mitchell & Henry Flanders, The Statutes at Large of Pennsylvania from 1682 to 1801, at 110–13 (1903) (disarming men above the age of 18 who failed to take the oath only "during the time of such neglect or refusal"); 7 William Waller Hening, Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature 38 (1756 statute) (Catholics who initially refused to take an oath could "take the said oaths" and "from thenceforth be discharged of and from all disabilities and forfeitures").

[18] *See, e.g.*, Mass. Rev. Stat., ch. 134, § 16 (imposing a "term not exceeding six months"); Me. Rev. Stat., ch. 169, § 16 (1840) (term "not exceeding one year").

*Finally*, Silvers devotes much of his brief to a broader conceptual point: that evidence of "relevantly similar" analogues isn't enough. Instead he maintains that the Government must identify statutes that are "*distinctly* similar" to § 922(g)(8), and may not rely on "analogical reasoning." *See* Motion to Dismiss (DN 245) at 7–8, 15 (emphasis added); Reply (DN 258) at 2–3. But the *Bruen* majority opinion belies this: "Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are *relevantly* similar." 142 S. Ct. at 2132 (citation and quotation marks omitted) (emphasis added). As discussed above, *Bruen* doesn't require the Government to operate at the narrow level of generality Silvers perceives. And the relevant similarities across these laws, as described above, are considerable in both number and import: the language of danger, peace, and threats; legal determinations of the same; applications in civil and criminal contexts alike; lasting for varying and contingent periods of time. If Silvers were right that a single material difference is enough, then *Bruen*'s entire mode of analysis would make little sense. "[E]ven if a modern-day regulation is not a dead ringer for historical precursors," the Court held, "it still may be analogous enough to pass constitutional muster." *Id.* at 2133.

*Bruen* elsewhere contemplated "the lack of a distinctly similar historical regulation addressing" a "general societal problem that has persisted since the 18th century." *Id.* This, the Court stated, is "relevant *evidence* that the challenged regulation is inconsistent with the Second Amendment." *Id.* (emphasis added). On this basis, Silvers appears to posit that the Supreme Court furnished litigants, lower courts, and law enforcement with two different tests: a "distinctly similar" test that requires linguistic precision for laws that address persistent societal problems, on the one hand, and a "relevantly similar" test based on analogical reasoning for laws that address "unprecedented societal concerns," on the other. Motion to Dismiss at 7; Reply at 3; *see also United States v. Perez-Gallan*, No. 22-cr-427, 2022 WL 16858516, at *8 (W.D. Tex. Nov. 10, 2022) (suggesting that a "strict reading" of *Bruen* "seemingly" requires evidence of a "distinctly similar historical regulation") (quotation marks omitted). And DVO orders of the sort imposed against him, he notes, did not appear until relatively recently in the United States' history and tradition of firearm regulation. Motion to Dismiss at 14, 16–17.[19]

Other "anticipatory" protective orders, however, long predated this incarnation. *See* Marshall, 32 Harv. J.L. Pub. Pol'y at 717. Certainly it's true that

---

[19] *See also Rahimi*, 61 F.4th at 457 (noting laws disarming dangerous and "disloyal" people lacked the specific purpose of preventing "domestic gun abuse") (quotation marks omitted); *United States v. Combs*, No. 5:22-136, 2023 WL 1466614, at *5 (E.D. Ky. Feb. 2, 2023) (similar).

the presence or absence of "a distinctly similar historical regulation" is "relevant *evidence*" of a measure's constitutionality.  *Bruen*, 142 S. Ct. at 2131 (emphasis added).  But "relevant" doesn't mean exclusive or conclusive; it doesn't erase other history and tradition such as that discussed above.  In any case, *Bruen* specifically contemplated "reasoning by analogy" when considering unanticipated "modern regulations."  *Id.* at 2132.  And *Bruen* and *Heller* alike emphasized the absence of historical laws "analogous" to the statutes at issue in those cases.  *Id.* at 2131.  So Silvers's argument that the Government "cannot defend § 922(g)(8) through 'analogical reasoning'" fails.  Motion to Dismiss at 15.

**5. Section 922(g)(8) as applied to Silvers.**  Even if these historical laws were insufficiently analogous, that alone wouldn't suffice to invalidate Silvers's indictment and conviction under § 922(g)(8).  A statute is facially unconstitutional only if it violates the constitution "in all its applications."  *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019).  That sort of showing is entirely absent from this motion and Silvers's arguments, although he at times frames his challenge as a facial attack.  He says nothing, for example, about the extent to which § 922(g)(8) applies to prevent gun possession in public.  Silvers wasn't convicted merely for possessing a gun at home despite the DVO; the jury found him guilty of traveling from Tennessee to a military base in Kentucky to murder his wife with a gun outside *her* home.  So this inside/outside distinction isn't enough to render § 922(g)(8) *facially* unconstitutional.  And "[a] person to whom a statute properly applies can't obtain relief based on arguments that a differently situated person might present."  *Stimmel*, 879 F.3d at 206 n.6 (quotation marks omitted).

Neither Silvers's motion nor his reply discusses the underlying facts of his case or mentions an as-applied challenge.  When asked at a pre-trial hearing, Silvers's counsel appeared to assert an as-applied challenge on the ground that Silvers didn't receive personal service of the underlying DVO.  *See* Judicial Notice Hearing Tr. (DN 292) at 74:8–24.  The defense later withdrew that objection, however.  So nothing in this opinion addresses whether and when an as-applied challenge to § 922(g)(8) might succeed based on arguments of insufficient dangerousness or inadequate state-court process.  *See, e.g.*, *United States v. Burgess*, Nos. 22-1110/22-1112, 2023 WL 179886, at *5 n.2 (6th Cir. Jan 13, 2023) ("*Bruen* did not change the landscape" on "the possibility of as-applied challenges" in the Second Amendment context.).[20]

_____

[20] Section 922(g)(8)(C)(ii) proscribes gun possession for individuals subject to a DVO that "by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury."  Curiously, this language—unlike that of § 922(g)(8)(C)(i)—doesn't require that a judge found the defendant to be a credible threat or otherwise dangerous.  So the relationship between § 922(g)(8)(C)(ii) and the dangerousness principle is not entirely clear.  *Cf. United States v. Emerson*, 270 F.3d 203, 262 (5th Cir. 2001) (concluding that Congress assumed

Such an argument—and any other as-applied argument—is undeveloped and therefore forfeited in this case. *See United States v. Harris*, 429 F. App'x 543, 545 (6th Cir. 2011). Regardless, whether Silvers received personal service of the DVO raises a different legal concern than the constitutionality of § 922(g)(8) under the Second Amendment. And on that score, nothing suggests that the state-court judge rubberstamped Brittney's petition or that Brittney sought the DVO for "tactical" reasons. *Cf. Rahimi*, 51 F.4th at 465 (Ho, J., concurring) (discussing such risks in divorce cases and other proceedings not necessarily focused on dangerousness). Silvers doesn't challenge the proof or process that led to the DVO. Perhaps for good reason: abundant evidence, as recounted above, supports a finding that he abused his wife while armed and posed a credible threat to her safety. Tragically, as the jury found, Silvers's subsequent actions—fatally shooting his wife—bore out that determination. So even if Silvers had pursued an as-applied challenge on this basis, it would fail.

## Order

The Court denies Silvers's motion to dismiss count five of the second superseding indictment.

Benjamin Beaton, District Judge

United States District Court

May 3, 2023

---

§ 922(g)(8)(C)(ii) applied to "court orders, issued after notice and hearing," that "either were not contested or … reflected a real threat or danger of injury"). Here no one disputes that the state court's DVO triggered (c)(i) by expressly finding Silvers to be a credible threat to Brittney's physical safety. Silvers, moreover, doesn't even discuss (c)(ii) in his motion to dismiss. So the Court need "not consider whether § 922(g)(8) would be constitutional as applied to a person who is subject to an order that was entered without evidence of dangerousness." *Bena*, 664 F.3d at 1185 (citing Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self–Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1504–05 (2009)).